**UNITED STATES, Appellee,**

v.

**Steven A. THOMAS, Private, U. S. Marine Corps, Appellant.**

No. 29,934.

U. S. Court of Military Appeals.

April 23, 1976.

*Major D. A. Higley*, USMC, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Walter A. Smith, Jr.*, JAGC, USNR.

*Lieutenant Thomas L. Earp*, JAGC, USNR, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel P. N. Kress*, USMC.

## OPINION

COOK, Judge:

Among other things, the accused was convicted of the wrongful possession of marihuana. In a wide-ranging challenge, he contends, as he did at trial, that the search of his wall locker that resulted in discovery of the marihuana was illegal.

Patrice was a Labrador bitch. She had been trained by the Navy at San Diego, California, to detect the odor of marihuana, but she was not trained in obedience. On an unstated number of occasions, she apparently "happen[ed] to tear something up" under circumstances that made the Government subject to claims for damage. In November 1973, Patrice was turned over by her trainer to Detective Munden of the Special Police Force, Naval Air Station, Norfolk, Virginia. Munden worked a "lot of . . . vacant barracks" with Patrice, and he believed her to be a "good" dog. In every instance that she "alerted," thereby indicating the presence of marihuana, he had found some evidence of the substance.

As a result of reports that the aroma of marihuana had been detected in the barracks, Lieutenant Colonel Palmateer, Executive Officer of the Marine Barracks at the air station, requested a dog team to go through the barracks. Sergeant Brown and his dog "usually" responded to such requests but Brown's dog was ill. Accordingly, on December 6, 1973, Detective Munden and Patrice responded to the colonel's request; Sergeant Brown accompanied them to do the "paperwork."

Lieutenant Colonel Palmateer was familiar with the work of marihuana detection dogs. He had witnessed a classroom demonstration by Virginia Beach Police Department dogs, and he had talked to dog handlers "as to how they train the dogs and the results." Before Patrice started her tour of the barracks, the colonel spoke to Brown and Munden about her capabilities. Brown advised him that she was "a good dog", "had a good track record", and he believed she was "as good as" his dog, which Palmateer had seen at work several months earlier with "excellent results." Munden also expressed his belief that Patrice was "a good dog." There is no indication the colonel was informed that Patrice had been trained by the Navy. When Patrice started on the walk-through, Palmateer watched her for about 10 minutes. He saw her "become very alert, paw at . . . [a] locker, and carry on in that manner." In his opinion, this behavior was "consistent" with that of the dogs he had seen in the classroom demonstration. Each of the lockers at which Patrice pawed was marked for later opening and examination, but the colonel was not present at that time, and, as far as appears from the record, he was not informed of the results of the examinations.

Although not fully described, it may be fairly inferred from the evidence that the inspection procedure was as follows: The inspection party proceeded down the middle of each squad bay, which was sectioned into separate cubicles by articles of furniture. Patrice was free. If she picked up the scent of marihuana, she circled a few times, straightened out, and then entered a cubicle to alert at the apparent source of the scent. The stronger the aroma, which Munden attributed to a larger quantity of the substance, the "more excited" Patrice became, and the more "eager [she was] to get to it [the substance]." Patrice could not "turn a handle"; consequently, if the scent emanated from a wall locker, she merely "pawed" at the locker door. The inspection party did not open any locker at which Patrice pawed. Instead, a piece of tape was affixed to the door to note that Patrice had alerted at it, and the occupant of the locker was called to the cubicle. On his arrival, he was informed of Patrice's alert, and asked to consent to a search of the locker. If consent was forthcoming, a search was made; if consent was refused, a member of the inspection party applied for authorization to conduct a search.

Just before the inspection, the occupants of the cubicles were escorted to an auditorium. At various times, individuals were called from the auditorium and escorted to their respective cubicles. There, they were informed that "the dog thought that there was something in there [in the locker]"; they were read their "rights" and were asked whether they would consent to a search of their "own free will." A defense witness testified that he and another occupant of the barracks were called. Both consented to a search, and when the search was made nothing was found.

The regular procedure was not followed with the accused. Without impeachment or rebuttal, he testified that, at the direction of Sergeant Yennis, he opened his wall locker before the inspection began and then went to the auditorium. What occurred at his cubicle during the inspection was related by Detective Munden and Gunnery Sergeant McLaughlin; their testimony differed.

Munden indicated that, as the inspection party came down the middle of the squad bay, Patrice apparently picked up a scent. She circled a couple of times, straightened, went to the accused's open locker, and "ran into it," pulling out a bread wrapper. The bag fell on the floor, and he picked it up, looked into it, and saw a substance which "appeared" to be marihuana. He returned the bag to the locker, gave Patrice a suitable reward, and left the cubicle with her to continue the inspection. McLaughlin testified that Patrice was "turned loose" as the inspection party came into the squad bay. She "worked a few cubicles . . . then went into the cubicle" occupied by the accused. As he and Munden came up, he saw Patrice inside the accused's locker. She backed out with a bag. He did not see Patrice jump about, and all he heard "was scratching as we got up into that area." No tape was put on the locker door. The accused was brought to the cubicle, and when he refused their request to give consent to a search, Sergeant Brown went to see the colonel to obtain an authorization to search.

Only Colonel Palmateer testified as to the application for the authorization to search. He stated that Sergeant Brown had told him the accused's locker "was one of those lockers the dog had gone to and it was one of the lockers they had marked." Brown had further informed him that all the occupants of the marked lockers except the accused consented to a search. Palmateer admitted that Brown had not described how Patrice "behaved" at the time she went to the accused's locker. He also conceded he had granted authority to search "[o]n . . . [the] basis alone" that Brown told him "this was a locker the dog had indicated that there was marihuana in."

My brothers and I agree, for different reasons, that the decision of the United States Navy Court of Military Review must be reversed as to the findings of guilty of specification 2, Charge I, and the sentence. Their reasons are set out in their respective, separate opinions; mine follow.

I believe the first matter for consideration is the nature of what appellate defense counsel describe as "the initial walk-through of the barracks." Counsel perceive it as a "general search conducted upon mere suspicion." Oppositely, Government counsel contend that a walk-through by Government agents in open spaces of a barracks is not an illegal search because it involves no entry into any area as to which the accused has a reasonable expectation of privacy. I agree with the Government.

As I pointed out in my dissent in *United States v. Miller,* 1 M.J. 367 (1976), the United States Supreme Court has held that the Government has "unfettered control" over property as to which it had a proprietary right. That right unquestionably extends to the common area-ways of military barracks, even those used as living quarters by military personnel. *See United States v. Troy,* 22 U.S.C.M.A. 195, 46 C.M.R. 195 (1973); *United States v. Anderson,* 175 U.S.App.D.C. 75, 533 F.2d 1210 (1976). I therefore see no wrong in the Government's entry into the barracks and the walk-through in the common corridors, irrespective of whether the Government agents were intent upon investigation of a criminal matter or engaged in a health and welfare inspection. Not until the agents actually intruded into property as to which the accused possessed a reasonable expectation of privacy could there be any question as to their authority or as to the legal consequence of what they did. *United States v. Anderson, supra.*

In his separate opinion, the Chief Judge appears to view the proceedings in the barracks as an administrative or health and welfare inspection. On that basis, and consistent with earlier decisions of the Court such as *United States v. Gebhart,* 10 U.S.C.M.A. 606, 28 C.M.R. 172 (1959), I believe he would sustain the legality not only of the walk-through along the common ways, but also the agents' entry into the accused's locker area. However, because of the high potential for "abuses inherent" in the inspection system, he would, in any "criminal or quasi-criminal proceeding or as a basis for establishing probable cause," forbid use of any evidence of wrongdoing discovered in the course of the inspection. I am constrained to disagree with this concept for at least two reasons.

First, the Chief Judge's concept would eliminate the "plain view" doctrine. Under this doctrine, a government agent lawfully at a place may use his ordinary senses, and if these provide probable cause to believe that contraband or evidence of a crime is before him, he may properly seize the prohibited substance or the evidence. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *United States v. Smeal,* 23 U.S.C.M.A. 347, 49 C.M.R. 751 (1975). The rule propounded by the Chief Judge would, therefore, have the effect of immunizing an individual not only from criminal prosecution, but from any "quasi-criminal proceeding," even though the evidence of his crime was come upon in the course of a lawful Government activity and in a way that was wholly accidental.

My second reason for disagreeing with the Chief Judge's exclusionary formula is that I see it, not as curbing potential abuses of the inspection process and safeguarding the personal rights of members of the military community, which I believe the courts of the military system have thus far been able to assure, *United States v. Mossbauer,* 20 U.S.C.M.A. 584, 44 C.M.R. 14 (1971); *United States v. Lange,* 15 U.S.C.M.A. 486, 35 C.M.R. 458 (1965), but rather as encouraging the flouting of law and regulations. Because there can be no criminal or quasi-criminal sanction, a prohibition of this kind is, in my opinion, more likely than not to produce, among other things, disdain for, and violation of, the laws and regulations prohibiting the possession and use of drugs. In other words, as the proposed rule removes the normal deterrent effect of penalties for criminal conduct, there is likely to be more such wrongdoing. With an increase in the quantity of wrongdoing, the frequency of inspections will necessarily increase. As a result, the great majority of

law-abiding occupants of Government barracks will be subject to more intense and more frequent intrusions into their privacy. Thus, it seems to me that the formula favors the wrongdoer by guaranteeing his freedom from punishment, while, at the same time, it subjects those who are law abiding to more pervasive invasions of their privacy than would otherwise be necessary.

At this point, I am brought to Senior Judge Ferguson's contention that "use of a dog, trained to ferret out the presence of contraband drugs" is a search within the Fourth Amendment, and constitutes "an intrusion into an area in which the appellant had a reasonable expectation of privacy." Dogs have long been used in police work. They often accompany police officers on night patrol to assist in detection, through sound and scent, of would-be robbers, burglars, and other criminals lurking in the dark or moving in stealth. I have not read, and have not heard, that because the patrol dog is endowed by nature with qualities of hearing and smell that appear to be superior to those of humans, his mere use, on a lawful patrol, is violative of the Fourth Amendment. That question, however, has arisen in regard to the use of dogs whose sensitive sense of smell has been trained to detect the characteristic odors of certain drugs.

Senior Judge Ferguson condemns the use of such a specially trained dog by extending the prohibition against the use of electronic equipment to overhear a conversation that was propounded by the Supreme Court in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). At the same time, Senior Judge Ferguson acknowledges that many courts have held, correctly I believe, that not all artificial aids to human senses are forbidden to the police; and, among the permissible devices are such sight improvers as binoculars, flashlights,

magnetometers, breathilizers, camera lenses, and, I would suppose, ordinary prescription glasses.

Although the issue may have been concluded for this Court in *United States v. Unrue,* 22 U.S.C.M.A. 466, 470, 47 C.M.R. 556, 560 (1973), for present purposes I need not postulate a standard by which to differentiate between those man-made devices that augment human senses beyond the limits attainable by a particular individual but do not come within the *Katz* condemnation, and those devices that do. In my opinion, *Katz* does not condemn utilization by Government agents of the special sense quality of other living things. On this basis, I reach the same result the Court reached in *Unrue,* namely, that use of a dog trained to use his natural sense of smell to detect special odors does not transform otherwise lawful Government conduct into an illegal search.

Whether the liberty of an individual should be subject to forfeit on the basis of the behavior of a dog has been the subject of divided judicial opinion.[1] Professor Wigmore has observed that "most Courts" have held admissible, evidence that tracking by a trained "dog has . . . [led to] the accused." 1 Wigmore, Evidence § 177(2) (3rd ed. 1940). This Court[2] and the United States Court of Appeals for the Second Circuit[3] have held that evidence of the behavior of a dog, consistent with his training and demonstrated ability to detect the presence of marihuana, can provide a basis for a conclusion that marihuana is probably present at a place indicated by it. For purposes of this appeal, I assume, without deciding, that the evidence of Patrice's previous training and of her work with Detective Munden was sufficient to support an inference that her behavior immediately before she left the aisle of the squad bay to enter the accused's cubicle[4] demonstrated

1. Annot., 18 A.L.R.3d 1221 (1968).

2. *United States v. Unrue,* 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973).

3. *United States v. Bronstein,* 521 F.2d 459 (2d Cir. 1975).

4. I express no opinion as to the validity of the immediate entry of Patrice and the inspection team into the accused's cubicle. I need not consider whether, in the circumstances, Detective Munden could properly open the bread bag and examine its contents.

she had detected the odor of marihuana. I assume, further, that Colonel Palmateer was familiar with the general behavior of a dog that had been trained to detect marihuana when it came into the presence of that substance, and that his observations of Patrice for 10 minutes sufficed to acquaint him with her special behavior when she detected the odor of marihuana. Neither of these assumptions bears upon the sufficiency of the evidence to justify the authorization to search.

Authorization to search must be predicated upon evidence before the issuing officer. *United States v. Vasquez*, 22 U.S.C.M.A. 492, 47 C.M.R. 793 (1973); *United States v. Clifford*, 19 U.S.C.M.A. 391, 393, 41 C.M.R. 391, 393 (1970). Munden's observation of Patrice's behavior before she entered the accused's cubicle, which was consistent with her training and experience on detection of the presence of marihuana, was not related to Colonel Palmateer. Instead, Brown informed the colonel only that Patrice had "gone to" the accused's locker. He said nothing about Patrice's circling before she alerted and nothing about her conduct at accused's locker that would allow the colonel to conclude that her behavior was consistent with the manner in which she had "carried on" during the period he had watched her work. Moreover, Colonel Palmateer had never known the results of the alerts he had seen; he did not, therefore, personally know of Patrice's capabilities. True, he had been informed at the beginning of the inspection that Patrice had a "good track record," but he was not informed at the application for the authorization to search of later events that materially affected the representation, and he was specifically misadvised as to an important circumstance of Patrice's encounter with the accused's locker. Patrice had alerted at two other lockers, but a search of them had produced no evidence of the presence of marihuana.[5] As to the misinformation, Brown's statement leaves no room to doubt

that he was representing that when Patrice went to the accused's locker, it was closed.

What effect an open locker had on Patrice's behavior is not clear from the record. For all the record suggests, her response to the accused's open locker might have been due to her lack of obedience training rather than to her marihuana detection training. Munden's testimony as to the Government's apparent willingness to take responsibility for damage caused by Patrice indicates there were occasions when her lack of obedience training led to intrusions unconnected with her detection response. The fact that Munden opened and examined the bag pulled out of the accused's locker by Patrice suggests that he was, himself, uncertain as to the significance of her action and felt impelled to check on it. I conclude, therefore, both from the standpoint of the insufficiency of the evidence of probable cause available to Colonel Palmateer and that of the materiality of the matters not presented to him, or misstated, the authorization to search was unwarranted. *United States v. Sam*, 22 U.S.C.M.A. 124, 127, 46 C.M.R. 124, 127 (1973); Analysis, 16 Crim.L.Rep. 2311 (1975).

As noted earlier, for the reasons indicated in the separate opinions, the decision of the United States Navy Court of Military Review is set aside as to the findings of guilty of specification 2, Charge I, and the sentence. The specification is ordered dismissed, and the record of trial is returned to the Judge Advocate General of the Navy for submission to the Court of Military Review for reassessment of the sentence on the basis of the remaining findings of guilty.

FLETCHER, Chief Judge (concurring in the result):

Two conclusions reached in Judge Cook's opinion cause me concern and warrant further analysis. The first is that a marihuana dog's sniffing of barracks lockers is a per-

---

5. Possibly, these alerts occurred after the incident with the accused; but, as the Government has the burden of demonstrating the sufficiency of the evidence to justify issuance of the authorization to search, the state of the record requires that I consider the alternative states in the text. *United States v. Berry*, 6 U.S.C.M.A. 609, 613, 20 C.M.R. 325, 329 (1956).

missible adjunct to an "administrative" inspection.[1] *Compare United States v. Grace,* 19 U.S.C.M.A. 409, 42 C.M.R. 11 (1970), *with United States v. Lange,* 15 U.S.C.M.A. 486, 35 C.M.R. 458 (1965). *See also Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 518 F.2d 466 (1975).[2] The second is that, if specified information obtained during such an inspection properly had been relayed to an individual with authority to initiate searches, such evidence could have served as a legitimate basis for authorizing a probable cause search, thereby qualifying the seized contraband for admission into evidence consistent with the Fourth Amendment. *See United States v. Unrue,* 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973). *Compare United States v. Bronstein,* 521 F.2d 459 (2d Cir. 1975), *with United States v. Solis,* 393 F.Supp. 325 (C.D.Cal.1975). *See also* Kingham, *Marijuana Detection Dogs As An Instrument of Search: The Real Question,* The Army Lawyer 10 (May 1973); Lederer and Lederer, *Admissibility of Evidence Found by Marijuana Detection Dogs,* The Army Lawyer 12 (April 1973).

Since early in its history, this Court has wrestled with the distinction, if any, between a military inspection and a search. *See, e. g., United States v. Grace, supra; United States v. Lange, supra; United States v. Davenport,* 14 U.S.C.M.A. 152, 33 C.M.R. 364 (1963); *United States v. Harman,* 12 U.S.C.M.A. 180, 30 C.M.R. 180 (1961); *United States v. Gebhart,* 10 U.S.C.M.A. 606, 28 C.M.R. 172 (1959). As evidenced by the present case, the net effect of these decisions has been to suggest to some commanders that they have carte blanche authority to conduct inspections for whatever purpose unless they initially suspect a particular individual of criminal ac-

tivity. In that event, compliance with the Fourth Amendment as applied in the military community is required. *United States v. Lange, supra.*

The converse of this is, of course, that the average serviceman has had minimal freedom from governmental intrusion unless and until he became a criminal suspect cloaked with Fourth Amendment protections. This has led to the anomalous situation wherein those suspected of criminal activity are afforded greater freedom from governmental intrusion in certain instances than those who have done nothing to disturb the military organization's tranquility. *See Camara v. Municipal Court,* 387 U.S. 523, 530, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), *overruling Frank v. Maryland,* 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959).

With that background as to the existing state of affairs, I turn to the marihuana inspection before us. It could hardly be argued that a military commander lacks a legitimate, substantial interest in assuring, through devices such as marihuana dogs, that he can field an effective fighting force on a moment's notice to defend the very liberties of the American citizenry with which we deal in instances such as the present case.[3] That is not to say, however, that servicemembers should, ipso facto, forfeit such constitutional protections which it is their duty to defend. *E. g., United States v. Kinane,* 1 M.J. 309 (1976); *United States v. Brown,* 10 U.S.C.M.A. 482, 28 C.M.R. 48 (1959). Nevertheless, it must be recognized that, in certain respects, the military society differs markedly from its civilian counterpart. *Parker v. Levy,* 417 U.S. 733, 743–44, 94 S.Ct. 2547,

---

1. The term "administrative" inspection has been used interchangeably in military practice with "health and welfare" inspection as well as "shakedown" inspection or search.

2. The efficacy of the Court of Appeals' decision in *Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 518 F.2d 466 (1975), is dubious, at best, in light of the guidelines announced by the Supreme Court in *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

3. In its opinion the Navy Court of Military Review correctly observed that "[i]n addition to maintaining at all times a force in readiness to carry out the command mission in the national defense . . . the commander is charged with a nondelegable responsibility to protect the health, safety, and welfare of the personnel assigned to him."

41 L.Ed.2d 439 (1974). For example, an employer in the civilian community would not attempt ordinarily to police the after-hours conduct of his employees, much less search their homes to encourage their sobriety and presence for work the following day. The more usual response to remedy such employee abuses would be simply to discharge such an individual from employment. In many instances, that alternative is not available to a military commander. Thus, he must be afforded additional leeway, even if not available in civilian jurisdictions,[4] to regulate the off-duty, on-base [5] conduct of his "employees" where such conduct has a *direct* bearing upon the serviceman's ability to perform his military duties.

This leads me to conclude that the paramount interests of our society demand that military commanders be given authority to conduct *reasonable* inspections to ferret out drug abuse even absent a showing of probable cause and even if the individual already is suspected of possessing contraband. *See Committee for GI Rights v. Callaway, supra; Contra United States v. Lange, supra.*

Having concluded that such inspections are "reasonable" in order to permit the military society to perform and accomplish its primary mission "to fight or be ready to fight wars should the occasion arise,"[6] the inquiry must proceed to the effect of such a course of action on the administration of military justice. In the past, this Court has authorized the receipt into evidence of contraband discovered during legitimate inspections. *See United States v. Grace, supra; United States v. Gebhart, supra.* However, with the exception of the customs search[7] and the stop-and-frisk related air-port search[8] cases, there has been a general reluctance in the civilian sphere to sanction, much less admit evidence seized during an administrative inspection in which the sole objective of the search was the discovery of criminal goods. The Supreme Court has been careful to limit such *statutorily authorized* inspections to instances in which a *regulated business* impliedly consented to the intrusions thereby justifying the searches on a well-recognized exception to the usual probable cause and warrant requirements of the Fourth Amendment. *See Almeida-Sanchez v. United States,* 413 U.S. 266, 270–72, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) *comparing United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) *and Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), *with See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) *and Camara v. Municipal Court, supra.*

It has been suggested by Government counsel that the commander's utilization of a marihuana dog was primarily "to enhance the performance of [the commander's] military mission." Yet, the fact remains that a marihuana dog's distinguishing attribute is his nose with its ability to ferret out a substance, possession of which is criminally punishable under the Uniform Code. *See* Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934. The discovery of marihuana in furtherance of legitimate military objectives necessarily involves the simultaneous discovery of marihuana for criminal action. This is particularly true under the Uniform Code wherein the commander presently wears three

---

4. *See Parrish v. Civil Service Commission,* 66 Cal.2d 260, 57 Cal.Rptr. 623, 425 P.2d 223 (1967).

5. *See Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971); *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969); *United States v. Beeker,* 18 U.S.C. M.A. 563, 40 C.M.R. 275 (1969).

6. *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976), *citing Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 100 L.Ed. 8 (1955); *accord, O'Callahan v. Parker, supra.*

7. *E. g., United States v. 12 200-ft. Reels of Film,* 413 U.S. 123, 125–26, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

8. *United States v. Bronstein,* 521 F.2d 459 (2d Cir. 1975); *United States v. Epperson,* 454 F.2d 769 (4th Cir. 1972), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972). *See also United States v. Dalpiaz,* 494 F.2d 374 (6th Cir. 1974); *United States v. Davis,* 482 F.2d 893 (9th Cir. 1973); *United States v. Slocum,* 464 F.2d 1180 (3d Cir. 1972).

"hats," that of troop commander, law enforcement officer, and quasi-judicial officer. *See* Articles 7, 9, 15, 30, and 33, UCMJ.

Appreciating that the broadening of a commander's authority to inspect to carry out his *military* mission inevitably would lead under existing admissibility standards to use of such inspections solely to conduct law enforcement operations or as a ruse for others within the military justice system to avoid the probable cause requirements of the Fourth Amendment,[9] I believe the exclusionary rule safeguard must be implemented to discourage such a course of action. *Cf. United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Linkletter v. Walker*, 381 U.S. 618, 636, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). Therefore, while I sanction the commander's constitutional right to conduct such inspections as part of his *command* function, the abuses inherent in any such inspection authority lead me to conclude that, to discourage future unlawful police activity, the fruits of all such inspections may not be used either as evidence in a criminal or quasi-criminal proceeding or as a basis for establishing probable cause under the Fourth Amendment.[10] *See Mayfield v. United States*, 276 A.2d 123 (D.C.App.1971).

I join Judge Cook in concluding that the fruits of the marihuana dog inspection were inadmissible. I also concur in the disposition ordered.

FERGUSON, Senior Judge (concurring in the result):

I am of the opinion that the use of a dog, trained to ferret out the presence of contraband drugs, for that purpose constitutes a "search" within the definition of the Fourth Amendment protection, and that the specific use in this case constituted an intrusion into an area in which the appellant had a reasonable expectation of privacy under circumstances which did not amount to probable cause. Hence, the search was unreasonable.

The law generally has recognized that the intrusion by Government agents into an area otherwise private by an artificial device which extends the personal senses is a "search."[1] For instance, the United States Supreme Court has so classified the use of mechanical listening or "bugging" devices which permit the listener to hear private conversations which he could not hear with his own limited senses. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). Similarly, an airport magnetometer which intrudes inside the clothing and handcarried luggage of air passengers and detects metal objects of a certain size, otherwise not discernible to the operator via his natural senses, is a search. *United States v. Albarado*, 495 F.2d 799 (2d Cir. 1974); *United States v. Bell*, 464 F.2d 667 (2d Cir. 1972), *cert. denied*, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972). Whether our society will tolerate these various me-

---

9. *Cf. United States v. Jordan*, 1 M.J. 145 (1976) (decision on reconsideration).

10. An otherwise legitimate warrantless search or intrusion by a commander would, of course, not be affected by nor fall within the purview of the exclusionary rule set forth herein. *See United States v. Kinane*, 1 M.J. 309 (1976); *United States v. Mathis*, 16 U.S.C.M.A. 522, 37 C.M.R. 142 (1967); *United States v. Burnside*, 15 U.S.C.M.A. 326, 35 C.M.R. 298 (1965).

1. This is to be distinguished from cases in which non-"Big Brother" types of instruments were used to heighten personal senses in order to survey an area which was not, under the circumstances, private. *E. g., United States v. Lee*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1972) (use of a boat searchlight); *United States v. Hood*, 493 F.2d 677 (9th Cir. 1974), *cert. denied*, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974) (use of a flashlight to look into a car at night); *United States v. Minton*, 488 F.2d 37 (4th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974) (use of binoculars); *Cobb v. Wyrick*, 379 F.Supp. 1287 (W.D.Mo.1974) (use of a flashlight).

chanical searches depends, of course, on whether in a given case the constitutional standard of reasonableness [2] is satisfied.[3] I see no persuasive reason for calling a dog search anything but that: a search, permission of which, likewise, will be measured by its reasonableness. To pretend otherwise is to do in legal fiction what the ostrich does in fact.

The cases of this Court which factually have involved the question whether the use of a marihuana dog was itself a search within the stricture of the Fourth Amendment, upon careful analysis, support my belief in the affirmative. In *United States v. Unrue*, 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973), after studying a regulatory search procedure involving marihuana dogs in the initial stage of the search, which procedure was " 'carefully limited in time, place, and scope' " [4] and which was designed to permit the subjects of the search an opportunity to avoid criminal liability, this Court concluded: [5]

> In our opinion, the Government's use of the dog to detect odors from the vehicle that a human inspector could not detect through his own sense of smell was not unreasonable.

Immediately following this statement, Judge Quinn wrote the following, which rationalizes this position: [6]

> In *Katz v. United States*, 389 U.S. 347 [, 88 S.Ct. 507, 19 L.Ed.2d 576] (1967), the United States Supreme Court held that an electronic device cannot be used by a Government law enforcement official to

expand his sense of hearing to enable him to listen to words uttered by a suspect into the mouthpiece of a telephone in a public telephone booth. Since then, it has been suggested that no sort of a device can be used by an agent to enlarge the range of his senses beyond normal human limits. See Rintamaki, *Plain View Searching*, 60 Mil.L.Rev. 25, 37–38 (1973); cf. *United States v. Loundmannz* [153 U.S.App.D.C. 301], 472 F.2d 1376 (D.C. Cir. 1972). For purposes of this appeal, we assume that *Katz* erects a barrier against Orwellian surveillance that can result from indiscriminate and uncontrolled use by the Government of the myriad of devices which modern technology can provide to probe into the privacy of person and place. Perhaps *Katz* would prohibit the search of a pedestrian by a police officer on a public street in daylight hours solely because an x-ray device in a police van parked at the curb indicated that the passerby had a gun in a jacket pocket. At the same time, however, we have no doubt that *Katz* does not prohibit a police officer on a night patrol from using a flashlight to illuminate dark places on a public street in which a burglar might be lurking. See *United States v. Wright* [146 U.S.App. D.C. 126], 449 F.2d 1355 (D.C. Cir. 1971), cert. denied, 405 U.S. 947 [92 S.Ct. 986, 30 L.Ed.2d 817] (1972). Whatever *Katz* may or may not enjoin in regard to augmentation of human senses, the rationalizing principle for any case of Government ac-

---

**2.** U.S.Const. Amend. V; *United States v. Kazmierczak*, 16 U.S.C.M.A. 594, 37 C.M.R. 214 (1967); *United States v. Hartsook*, 15 U.S.C. M.A. 291, 35 C.M.R. 263 (1965); *United States v. Battista*, 14 U.S.C.M.A. 70, 33 C.M.R. 282 (1963).

**3.** As to listening devices, for instance, sans probable cause which itself supports a conclusion of reasonableness, this search technique is not lawful, as it meets none of the non-probable cause exceptions and is indiscriminate in matter "seized." The use of the airport magnetometer, on the other hand, has been rationalized as reasonable. Its use was born out of a substantial pressing public safety mandate; the conditions of its use—that is, under proper warnings which permit a passenger to rid him-

self of any items possessed prior to submitting to the device's scan or to turn back completely—are restricted; and the matter "seen"— metal objects of a certain mass—is limited in scope. Most importantly, no passenger who is searched by this electronic instrument has a reasonable expectation of privacy vis-a-vis the limited intrusion involved.

**4.** 22 U.S.C.M.A. at 470, 47 C.M.R. at 560, *citing United States v. Biswell*, 406 U.S. 311, 315, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

**5.** *Id.* at 470, 47 C.M.R. at 560.

**6.** *Id.*

tion that is opposed to the individual's claim of privacy is the constitutional standard of reasonableness; if what the Government agent does is reasonable, there is no violation of the Fourth Amendment. *United States v. Kazmierczak,* supra.

Thus, although the Court did not expressly address the issue herein of concern, implied both in its opinion above first-quoted and in its rationale therefor which follows is that the use of the dog in that case was, indeed, a search. Otherwise, there would have been no reason for the Court to feel constrained to determine that the use of the dog under the circumstances was "not unreasonable."

In *United States v. Carson,* 22 U.S.C.M.A. 203, 46 C.M.R. 203 (1972), a marihuana dog was permitted to check the baggage of the appellant and his two companions in a military airport terminal, after they had applied for flight space but before they had yet committed themselves to travel or checked their baggage. In fact, one of the three was with the luggage at all times while waiting in the terminal. This Court decided that the search which followed the dog's alert was not a "customs-like" search, which was the theory of the Government on appeal. In so ruling, the Court found pivotal the facts that normally the dog did not check any baggage until *after* it was checked for a flight and that in that case the accused had not in fact checked his luggage, but rather had retained control over and possession of it. Although, as indicated, the use of the dog as a search was not determined expressly, the same consideration would have dictated the same result had the dog been viewed as the search instrument, that is, the accused had not given up his reasonable expectation of privacy in his locked luggage which remained in his possession and control.

Moreover, the rationale underlying the decisions of the Federal district and circuit courts in this area do not support a conclusion to the contrary, despite the purported

holdings. For instance, the U. S. Court of Appeals for the Second Circuit in *United States v. Bronstein,* 521 F.2d 459 (2d Cir. 1975), responding to a claim by the defendant that the use of a marihuana dog was a warrantless search without probable cause, opined that if a police officer had smelled the contraband with his own senses there could have been no complaint and that the court perceived no difference whether the sniffing was done by a policeman or by a dog.

However, the court's analysis of the facts and the law was not this simplistic. Based upon a reliable tip regarding two suspicious passengers en route to the destination airport, law officers thereat walked a dog past the luggage from the flight after it had landed and was waiting to be claimed. When the dog alerted, the two men subsequently were arrested. While an officer had left to obtain a search warrant, the two men consented to a search of their luggage. While purporting to hold that the use of the dog in that case was not a search at all, the court's rationale for the ruling belies this position and indicates in reality that the search by the dog was sustained as reasonable on the ground that the defendants had abandoned their expectations to privacy in the luggage when they had checked it onto the flight.[7]

> "What a person knowingly exposes to the public even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 . . . and see *United States v. Johnston, supra,* 497 F.2d [397] at 398 [9th Cir. 1974].

Further support of what I see as the court's true basis for its decision in *Bronstein* is found in footnote 2 of the opinion in which the court references a Federal district court opinion which squarely held that the use of marihuana dogs constituted a search:[8]

> In *United States v. Solis,* 393 F.Supp. 325 (D.C.Cal., 1975), it was held that the

---

7. *United States v. Bronstein, supra* at 462.

8. *United States v. Bronstein, supra* at 461 n. 2.

use of marijuana-detecting dogs constituted a search per se under the Fourth Amendment. Aside from the fact that this case is not binding upon us, we note that the dogs in *Solis* sniffed at a closed trailer, which the court held to be a "private place" where there was a reasonable expectation of privacy. Moreover, the dogs were employed in response to a tip from an informer of unproven reliability.[9]

I believe, then, that logic compels and law supports the conclusion that the use of a dog trained to detect contraband drugs constitutes a search within the meaning of the Fourth Amendment. The only question to be asked in such cases, as in all search cases, is whether the intrusion into another's privacy by the Government was reasonable. As there existed no probable cause to believe that the appellant was in possession of marihuana in his enclosed area in the squad bay, as none of the exceptions to the probable cause requirement is supported by the record, and as I have no doubt but that the appellant did have a reasonable expectation of privacy in his wall locker in that area, I concur in the disposition ordered by Judge Cook, but for the reason that under the circumstances of this case the contraband evidence was discovered and seized as a fruit of an unlawful search by the dog.

---

9. If the use of the dogs was not viewed as a search, there would have been no need to discuss the private nature of the place sniffed or the unreliability of the informant upon which basis the dogs were sent to sniff.