UNITED STATES

v.

Airman First Class Richard E. PAULSON, FR 526–13–7775 Headquarters, Aerospace Audiovisual Service Twenty-Second Air Force (MAC).

ACM S24420.

U. S. Air Force Court of Military Review.

Sentence Adjudged 13 May 1976.

Decided 9 Dec. 1976.

Appellate Counsel for the Accused: Colonel Jerry E. Conner, Colonel Robert W. Norris and Captain Thomas S. Markiewicz.

Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr., and Major Alvin E. Schlechter.

Before BUEHLER, HERMAN and ORSER, Appellate Military Judges.

## DECISION

BUEHLER, Senior Judge:

Tried by a military judge sitting as a Special Court-Martial, the accused was convicted, contrary to his pleas, of one specification of wrongful possession of ampheta-

mines and one specification of wrongful possession of marihuana, in violation of Articles 92 and 134, Uniform Code of Military Justice. Consistent with his plea he was also found guilty of wrongful possession of marihuana. The approved sentence extends to a bad conduct discharge, confinement at hard labor for 4 months, forfeiture of $240.00 per month for 3 months and reduction to airman basic.

On appeal, appellate defense counsel have assigned two errors challenging the admissibility of contraband drugs seized during a search of the accused's room in a barracks building at Norton Air Force Base, California. Before addressing the specific complaints advanced by counsel, we will briefly summarize the operative facts which led to the accused's conviction.

On the night of 8 March 1976, Special Agent Casey of the Air Force Office of Special Investigations (OSI), received unreliable hearsay information that an individual residing on the first floor of barracks 423, Norton Air Force Base, California, was in possession of one lid of marihuana. Casey's source was able to identify the drug possessor only as "Rick." Agent Casey and a fellow agent named Mitchell duly investigated the matter. The investigation soon focused on the accused. Examination of a base personnel roster disclosed that he was an occupant of room 108 in barracks 423, and that his first name was Richard.

On the basis of this information, Agent Casey consulted the base staff judge advocate for his opinion on whether there was sufficient probable cause to search. That functionary was of the opinion that the information would not justify a search of the room in question, but was nevertheless sufficient to warrant the use of a marihuana detection dog in the barracks. Thereafter, the Base Commander, Colonel Green, was contacted and after being briefed by Agent Casey, approved the use of a dog and handler in the hallway of the first floor of barracks 423.

Agents Casey and Mitchell, accompanied by a dog handler, Sergeant Evens and a dog named "Lady," proceeded to the barracks.

Evens was not told the name of the suspect, nor the room he was thought to occupy. Entry was made at the north end of the barracks. Halfway down the corridor, at room number 108, Lady made her first alert. The agents knocked on the door and were admitted. The occupant was not the accused and gave permission for the dog and handler to enter. Nothing was found in 108 and the walk-through continued. Back in the hallway, Lady, in the words of Sergeant Evens,

. . . started to make a direct beeline to the end of the barracks, to the opposite end. She was starting to jump, prance with her head, throw her head high and her nose, and, to me, it seemed, at that time, she was indicating that she was getting a drift of air. The door at the far end was open. We walked down there, and she went out the end of the barracks. When we got down to the end, she kind of cast around outside. She stuck her head outside and immediately did a spin, like a 360-degree spin. She just turned right around and went to the doorway, again, on the right side. She went down to the seam of the doorway, where the door and the carpet meet and started to sniff real strong. She was really sniffing very strong. She started to come up to the doorknob. When she got up to the doorknob, she stood up on her back legs and started to scratch on the door and, in fact, she bit it a couple of times. At that time, I backed her off, and I informed Mr. Mitchell and Mr. Casey that she was definitely onto something this time. She was very strong, she was very interested in the door. In fact, at one point, she started to bark. She really wanted to get into that room.

Agent Casey knocked on the door and some five minutes later the occupant advised that the door was open. Casey opened it and saw an individual in one of the beds. The individual came to the door and turned on the light. Casey recognized him as the accused, Airman Paulson. He then called Colonel Green and informed him that Lady had alerted on room 124, occupied by the

accused. He did not describe Lady's actions during the alert on room 124, nor did he advise Colonel Green of the previous alert on room 108. Colonel Green gave verbal authority to search room 124.

Before the actual search began, Sergeant Evens fully advised the accused of his rights. The accused stated that he did not wish to consult a lawyer. At this juncture, and before the search commenced, Agent Mitchell advised the accused that a thorough search of the room would be made and if he had any contraband, or anything of like nature, it would be best if he presented it. The accused went immediately to a locker, removed a meerschaum pipe and gave it to Mitchell, saying it was all he had.[1] During the subsequent search, the drugs which form the basis of the accused's conviction were discovered.

Marihuana was found in a packet that dropped from a civilian shirt lying on a bed opposite from the accused's. While the room was being searched the accused had attired himself in a pair of trousers which were lying next to this shirt, but had donned a shirt he took from his locker. After returning from a commander-directed urinalysis test, he was asked if the shirt on the bed was his and he responded in the affirmative. In a voluntary statement made several hours subsequent to the search of his room, the accused admitted that the substances seized, and later determined to be amphetamines and marihuana, were his.[2]

In the first of their assigned errors, appellate defense counsel contend:

THE MILITARY JUDGE ERRED IN ADMITTING AND SUBSEQUENTLY CONSIDERING PROSECUTION EXHIBITS 2, 3, 4, 5, 6 AND 8, THE FRUIT OF A STATEMENT OBTAINED FROM THE APPELLANT IN VIOLATION OF ARTICLE 31, UCMJ.

We disagree.

■ Counsel argue that the Government failed to show that the accused affirmatively waived his right to remain silent after a proper advisement by Sergeant Evens. They point to the accused's nonverbal act of going to his locker, removing a pipe, and giving it to Agent Mitchell. Since this act followed a request by Mitchell to turn over any contraband or things of that nature, they would have us find unlawful conduct in the acquisition of Prosecution Exhibit 2, a pipe, which renders Exhibits 3, 4, 5, 6, and 8 inadmissible as fruits of the poisonous tree. *United States v. Battle,* 43 C.M.R. 927 (A.F.C.M.R.1971) and cases cited therein.

Even if the accused's condition was such that he could not have waived his Article 31 rights, we do not find that Mitchell's questions rendered the ensuing search unlawful.

Prosecution Exhibit 2, contrary to counsel's assertion, is not the same pipe which the accused handed to Agent Mitchell. Rather, it is a corncob pipe independently found by the agents during the course of the search authorized by Colonel Green. Further, the accused's act of going to his locker did not aid the Government's case in establishing ownership of the item. The agents had already determined that the entire room was to be searched. In the same locker the agents found a leave-and-earnings statement bearing the accused's name.

Furthermore, any possible error stemming from the accused's identification of the shirt, was cured by the military judge's ruling that he would not consider any statement made by the accused in relation thereto.

In their remaining error, appellate defense counsel aver:

---

1. This was the only item turned over to the agents by the accused.

2. Among the reasons stated for delaying the interrogation was the observed condition of the accused when entry to his room was made. Evens said that during the entire time he was in the room, the accused looked and appeared to be incoherent. Agent Casey recommended the urinalysis because of his suspicion that the accused was under the influence of amphetamines. He was also concerned that the accused couldn't intelligently waive his rights.

THE MILITARY JUDGE ERRED IN OVERRULING THE OBJECTION TO THE ADMISSION INTO EVIDENCE OF PROSECUTION EXHIBITS 2, 3, 4, 5, 6 AND 8 ON THE GROUND THAT THEY WERE THE PRODUCTS OF A BARRACKS SEARCH BY A MARIJUANA DETECTION DOG, NOT LAWFULLY AUTHORIZED WITH PROBABLE CAUSE.

■ Clearly, the informant's tip was inadequate to furnish probable cause to authorize the search of the accused's room. *United States v. Lidle,* 21 U.S.C.M.A. 455, 45 C.M.R. 229 (1972). However, a tip may be acted upon if elements thereof are corroborated before a search actually occurs. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. McFarland,* 19 U.S.C.M.A. 356, 41 C.M.R. 356 (1970).

Contrary to appellate defense counsel's assertion, the accused's room had not been singled out for investigation because of the informant's tip. Although the OSI agents had information which led them to suspect that marihuana would be found in a room on the first floor of barracks 423 occupied by an airman named "Rick," that information was never conveyed to the dog handler. Sergeant Evens was merely told to walk his dog through the hallway of the first floor of barracks 423. Furthermore, the information possessed by the agents was that "Rick" resided in room 108, not 124.

Counsel further aver that the failure to apprise Colonel Green of Lady's false alert on room 108 and to communicate the manner in which Lady alerted at the barracks door of room 124 rendered any finding of probable cause unlawful. In support of this contention they cite the Court of Military Appeals' decision in *United States v. Thomas,* 24 U.S.C.M.A. 228, 51 C.M.R. 607, 1 M.J. 397 (1976), and this Court's decision in *United States v. Ponder, infra.*

When a dog has been trained to detect the odor of drugs and this capability has been proven, sufficient probable cause exists to search any person or property upon which such a dog has alerted. *United States v. Unrue,* 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973). Cf., *United States v. Ponder,* 45 C.M.R. 428 (A.F.C.M.R.1972) pet. denied, 45 C.M.R. 928 (1972). *United States v. Boisvert,* 1 M.J. 817 (A.F.C.M.R.1976).

In *Thomas,* a search was authorized on information that a marihuana detection dog, Patrice, had "gone to" the accused's locker. Nothing was related as to her behavior. The authorizing official was familiar with the general behavior of a dog trained to detect marihuana. Before the search in question he had been advised that Patrice was a good dog, believed to be as good as another dog he had seen at work several months earlier with excellent results.

He had observed Patrice's conduct before other lockers shortly before the alert on the accused's. In his opinion, that behavior was "consistent" with the behavior of dogs he had seen in classroom demonstrations. He was not, however, present when the contents of those lockers were examined nor was he advised of the results of the alerts by Patrice he had witnessed.[3] As a result, the authorizing official did not personally know of Patrice's capabilities. On the basis of these circumstances, Judge Cook, who authored the lead opinion, concluded that the evidence available was insufficient to support a finding of probable cause.

■ The deficiency in proof noted by Judge Cook in *Thomas* is not present in the instant case. Here Colonel Green had on previous occasions observed Lady's behavior, was familiar with her conduct before an alert and the results of those alerts. Furthermore, he personally knew Sergeant Evens, and had been briefed by Evens of Lady's background, training and reliability. Indeed, he had "certified" her reliability based upon observed demonstrations.[4]

---

3. Examination of the contents of those lockers failed to disclose the presence of marihuana.

4. Lady's reliability as a drug detection dog was in excess of 90%, a fact known to Colonel Green.

In these circumstances, we find that the failure to apprise Colonel Green of Lady's false alert on room 108, and to fully describe her behavior in front of room 124 when seeking search authorization, were not material omissions and did not, therefore, affect the otherwise sufficient evidence of probable cause to search.

In this connection we adopt the excellent discussion of a drug detection dog's role contained in a memorandum of decision submitted by the Military Trial Judge. Manual for Courts-Martial, 1969 (Rev.), paragraph 74*i*.[5]

Counsel attack the lawfulness of the search on yet another ground. Again citing *United States v. Thomas, supra*, they submit that at the time of appellant's court-martial the law was and remains that evidence secured during a search authorized through use of a marihuana detection dog is inadmissible in a criminal proceeding. We disagree.

While there may be some support for counsel's position in the opinions expressed by both Chief Judge Fletcher and Senior Judge Ferguson in *Thomas*, the facts of the instant case significantly differ from those of the *Thomas* case. In *Thomas*, the dog, Patrice, was allowed to freely enter the occupants' cubicles to detect the presence of drugs with neither the consent of the occupants nor search authorization based upon probable cause.

In different circumstances, such as here, we do not choose to speculate on the views of the majority of the Court of Military Appeals as to this issue.

We find nothing unlawful in the Government's conduct in this case. Neither Lady nor any of the OSI agents was allowed to enter the accused's room until after permission to search based on probable cause had been given. We are not aware of any precedent in the military that extends a barracks room occupant's reasonable expectation of privacy to common areas or to smells emanating into such areas.

■ A marihuana detection dog, when on a permissible walk-through of open spaces involving no entry into a constitutionally protected area, acts merely as an informant whose reliability, like that of a human informant, once established, can furnish the basis to support probable cause for an ensu-

5. *The Manner of the Alert.* While the OSI Agent did not inform the magistrate of the precise manner in which he saw Lady alert at the accused's door, he *did* inform him that *the handler, SSgt. Evens, said the dog had alerted at the accused's door.* At first blush, it might appear that the magistrate improperly relied upon a conclusion by the handler, rather than making his own independent determination based upon the facts giving rise to probable cause, but this is *not* the case.

Clearly, the dog and handler function as an integral team. The dog is the sensor, and the handler is the trainer and interpreter. The handler's performance in both roles is inseparably intertwined with the dog's overall reliability rate as discussed above. And since the net result is the product of the interaction between two living beings, both roles of the handler are highly subjective. Significantly, the Air Force narcotic detection dogs are not trained *how* to "alert" or demonstrate their detection of drug odors. Each dog develops an *individual* pattern for communicating an alert, which must be interpreted by the handler, or another familiar with *that* dog. Otherwise, for example, a reaction to the odor of food, or another animal, might be mistaken for an "alert" to drug odors.

Thus, communicating only the dog's actions to the commander might mislead him into an erroneous determination of probable cause. In this regard, it must be emphasized that the informant is the dog, *not* the handler. The handler merely interprets the dog's actions. By stating that Lady had "alerted," SSgt. Evens was merely giving a shorthand interpretation of her behavioral communication to him that she detected drugs odors in the hallway outside the accused's door. Thus, the conclusion of fact, if any was that of *Lady*, not SSgt. Evens. And it was an inference of the type which may be made from personally observed facts which cannot be adequately conveyed by their mere recitation (Para. 138*e*, MCM (1969) (Rev. ed.)), and which Lady was well qualified, and under the circumstances, singularly competent to make. To describe Lady's actions to the commander would have served no more useful purpose than quoting a Chinese informant to a magistrate not conversant in the Chinese language. The failure of the OSI Agent to describe the motions and behavior of Lady in detail to the magistrate is therefore of no legal consequence in assessing the validity of the search authorization.

ing search. See *United States v. Unrue* and *United States v. Ponder*, both *supra.*[6]

Since the instant case does not involve a deficiency of proof as to an informant's reliability, as was found by Judge Cook in *Thomas*, nor a general exploratory search as found constitutionally intolerable by Judge Perry under facts similar to those in *Thomas* (*United States v. Roberts*, 25 U.S.C. M.A. 39, 54 C.M.R. 39, 2 M.J. 31 (1976)), we conclude that the exhibits were properly admitted.

Accordingly, the findings and sentence are

AFFIRMED.

HERMAN and ORSER, Judges, concur.

---

6. We are not unaware that the Court of Military Appeals recently granted a petition for review in a case where, after receiving a tip, a locked car in a parking lot was searched, based upon a dog alert, which this Court held to furnish sufficient probable cause. *United States v. Grosskreutz*, U.S.C.M.A. Order No. 32,376 (30 June 1976).