**Richard J. JACOBSON, Appellant,**

v.

**$55,900 in U.S. CURRENCY, Respondent.**

**No. A05–60.**

Supreme Court of Minnesota.

March 15, 2007.

---

Randall D.B. Tigue, Minneapolis, for appellant.

James C. Backstrom, Dakota County Atty., Margaret M. Horsch, Asst. County Atty., Kathryn M. Keene, Asst. County Atty., Dakota County Judicial Center, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Following the arrest of Jeffrey Carlisle, an admitted drug dealer, Dakota County notified Richard Jacobson that the county intended to forfeit $55,900 in cash seized from a safe located in the apartment Jacobson rented to Carlisle. Jacobson disputed the county's decision and demanded a judicial determination of the forfeiture. At the subsequent trial, the county presented evidence that a certified drug detection dog had identified drug odor on the cash. Both Jacobson and Carlisle testified

that Jacobson was not involved in Carlisle's drug dealing and that the $55,900 did not belong to Carlisle. The district court issued a forfeiture order after finding that Jacobson had failed to rebut a statutory presumption that cash found in proximity to drugs is subject to forfeiture. Jacobson moved for amended findings, arguing that Carlisle's testimony constituted sufficient evidence to rebut the presumption and that the court improperly considered the dog sniff evidence. The court denied the motion. Jacobson appealed to the Minnesota Court of Appeals, which affirmed the district court. Jacobson then petitioned our court for review of two issues: (1) whether a district court may consider witness credibility when it decides whether a claimant has rebutted the statutory presumption; and (2) whether dog sniff evidence is admissible to prove a connection between cash and drug trafficking. We reverse and remand for further proceedings consistent with this opinion.

In January 2003, Dakota County Drug Task Force agents executed a search warrant at the home of Jeffrey Carlisle and seized approximately two pounds of marijuana and other contraband. They also seized approximately $28,000 of Carlisle's cash from a dryer at the home of his girlfriend. In August 2003, task force agents again executed a search warrant against Carlisle, but at this time Carlisle was living in an apartment he rented from appellant Richard Jacobson. The apartment is located above Jake's Bar, a business Jacobson had owned and operated until it closed in October 2002. The August search yielded approximately eight pounds of marijuana and other contraband. Agents also found $14,880 in a microwave in the kitchen and $55,900 in a locked safe in the bedroom.

Five months after the search, Dakota County notified Jacobson that it intended

to forfeit the $55,900 found in the safe. Jacobson demanded a judicial determination of the forfeiture. At trial, the county called two witnesses: task force agent John Grant and state trooper Robert Frisby. Both officers participated in the search and seizure operation at Carlisle's apartment.

Grant testified that task force agents found the eight pounds of marijuana on shelves just inside the entrance to the apartment. He also stated that in the safe in Carlisle's bedroom, agents found $55,900 in bills of varying denominations and an expired Arizona driver's license in Jacobson's name. Some of the bills were of the older, symmetrical design, while other bills were of the newer, asymmetrical design.[1] One was a $1,000 note wrapped in a plastic cover. With the exception of this $1,000 note, the bills the agents seized were not available at trial because the county deposited them in the bank. No testing was conducted on the bills before they were deposited to determine whether they contained drug residue.

Before the task force agents opened the safe, they called Officer Frisby to bring his certified drug detection dog Nikki to help locate any money and drugs the agents might have missed. Frisby testified that Nikki has been trained to detect the base odors and derivatives of five different drugs—marijuana, methamphetamine, cocaine, heroin, and psilocybin mushrooms.[2] He described Nikki's original training and certification, as well as the annual certification and monthly "maintenance training" she has received since Frisby and Nikki began working together in 1999. He explained that the training process essentially consists of teaching a dog to associate the odors of controlled substances with rewards.

Frisby explained that when Nikki detects drug odors, she gives an "alert"—a visible physical response that includes a change in her breathing. She then "indicates" the source of the odor by biting and scratching at it. The source can be either the actual drugs or items that have drug odor on them, such as cash. Frisby stated that since 1999, Nikki had been involved in approximately 2,700 searches and alerted to drugs at approximately 680 of these searches.

Frisby next described Nikki's training to detect drug odors on cash. He stated that during a training session the previous month, neither Nikki nor any of the other dogs alerted to $100,000 in circulated cash until handlers "odored" it by placing it in close proximity to drugs for less than 15 minutes. Frisby explained that once handlers odored the cash,

> the dogs would alert and indicate on odor and you could tell after a period of time that the scent would dissipate. The longer the currency had been away from the drug, the harder it became for the dogs to alert and indicate on it.

He stated that from his observation of Nikki in training sessions over the past five to six years, drug odor "dissipates rather quickly from currency once it is removed from the close proximity of the drugs." Frisby said that in training sessions, Nikki never alerted or indicated on cash that did not have drug odor.

---

1. It appears that the court ultimately found that the newer asymmetrical $20 bills (those with the portrait of President Andrew Jackson slightly off center) started with the United States Treasury's 1996 banknote series or earlier.

2. On cross-examination, Frisby acknowledged that Nikki's alert is the same, regardless which of the five drug odors is present.

Frisby further testified that when he first led Nikki through Carlisle's bedroom, she alerted and indicated at several locations, including the safe next to the bed. But she did not alert on the surface of the bed when Frisby led her over it. Frisby then informed the task force agents about Nikki's reactions, and the agents opened the safe. Frisby stated that the agents took the cash from the safe and placed it in several bundles on the bed. After ascertaining that none of the agents who touched the cash had contaminated it by previously touching the drugs in the apartment, Frisby called Nikki to the top of the bed.

At this point in the trial, Jacobson interrupted Frisby's testimony in order to ask some questions to lay a foundation for an objection to the dog sniff testimony. In response to Jacobson's questions about Nikki's error rate, Frisby explained that the focus of Nikki's ongoing training is to determine whether she fails to alert when drugs are present and alerts when no drugs are present. He stated that a record had been made to document each of Nikki's 2,100 "training sniffs," and he "guesstimated" her error rate to be one to two percent "at the most." After the county resumed its questioning, Jacobson started to object to Frisby's testimony for lack of foundation, but then apparently changed his mind, saying "Well, I'll let [the county] ask the question and I'll raise the objection [then]."

The county then resumed its questioning. Frisby stated that after he called Nikki to the top of the bed, she indicated on the bundles of cash that agents had placed there. Jacobson objected on the ground that there was "insufficient foundation laid as to the reliability of the dog." The court overruled the objection, stating:

I think it goes to the weight that I g[i]ve to [the dog sniff evidence]. I agree it would have been a stronger basis [for identifying drugs on the cash] if they would have tested the currency itself, but I think based on [Frisby's] testimony over 2,700 street sniffs, 2,100 tests and one to two percent false positive ratios, I think he's got enough foundation to testify and it goes to weight.

Shortly thereafter, the county asked Frisby whether Nikki would have alerted to the cash if it had not come in contact with narcotics for several years. This time Jacobson objected on the ground that no foundation had been laid for Frisby's opinion. The district court sustained this objection, stating that the county would have to lay additional foundation before it could elicit Frisby's testimony in response to this question. After a brief exchange between the county and Frisby, the court asked Frisby what specific training he had completed regarding the amount of time it takes for odors to dissipate or how odors are absorbed. Frisby acknowledged that he had not completed any coursework on the chemical makeup of odors or how long odors could remain on various items. He repeated that in his experience at training with Nikki, the longer an item remains in proximity to drugs and the closer the proximity, the longer the item retains the odor. After several more questions from the county about the nature of Nikki's training and what Frisby had observed regarding the dissipation of odors, the court told the county, "I don't think you're ever going to get to the point where you're going to make an expert out of him. * * * [H]e can testify to his observations." After a brief cross-examination, redirect examination, and recross-examination, Frisby's testimony ended.

Jacobson called four witnesses, the first of whom was Carlisle. Carlisle testified that he and Jacobson were friends, and that he had purchased a business from

Jacobson two years before he moved into the apartment above Jake's Bar. Carlisle admitted he sold marijuana out of the apartment and that he had pleaded guilty to a charge of selling marijuana. He also testified that he kept his drug proceeds in the microwave. When asked if he ever used the bedroom safe from which task force agents seized the $55,900, Carlisle replied, "Uh, no. * * * [Y]ou know, $14,000 * * * would probably be safer in a safe than in a microwave." Carlisle said that he never knew the combination to the safe and had never tried to get into it, and that he did not think the safe contained any money. He stated that Jacobson knew about Carlisle's drug problems at the time Carlisle moved into the apartment, but Jacobson had nothing to do with Carlisle's drug dealing.

Jacobson's next witness was Bradley M., a former employee of Jake's Bar who had worked for Jacobson for eight to ten years. Bradley M. testified that while he worked at the bar, Jacobson lived in the upstairs apartment. He stated that he had seen Jacobson use the safe on multiple occasions and that Jacobson had once taken a $1,000 bill out of the safe to show him. Bradley M. further testified that after Jake's Bar closed, he lived in the apartment for three to four months. He stated that while he lived there, the safe was still in the bedroom, covered with a towel, but that he never had access to it. He testified that the safe was in the apartment when he moved out.

Jacobson's next two witnesses were his former girlfriend—who was also a former Jake's employee—and his mother. Both testified that they had seen Jacobson using the safe on numerous occasions while he lived in the apartment. Both also testified that they remembered Jacobson showing them a $1,000 bill while he lived in the apartment.

Jacobson was the final witness. He testified that he had worked as a manager at Jake's Bar from 1992 until he bought the building in 1997, and that from 1997 until the bar closed in October 2002, he owned and operated the business. He stated that he moved into the apartment above the bar in early 1992. Sometime thereafter, Jacobson said, he arranged to have a safe moved from the basement to the apartment bedroom. Jacobson testified that he hired a locksmith to open the safe and to give him the combination, and that he used the safe "all the time" while he owned Jake's Bar to secure business and personal items. He also testified that he kept a $1,000 bill in the safe. He said he had purchased the bill in 1995 or so and that it was now worth approximately $2,000.

Jacobson further testified that after he bought a new safe for the bar in about 2000, he stopped using the bedroom safe. He stated that he used the bedroom safe as an end table and always kept it covered with a towel. He said that when he moved out of the apartment, he left the bedroom safe behind because he "just never got around to [moving it]," and he could not lift it.[3] Jacobson explained that he did not remove any of the safe's contents when he moved out of the apartment because he figured "they would probably be safer there. The building has security[,] * * * and [he] still stayed there from time to time when [he] didn't feel like driving home." Jacobson stated that even after

---

**3.** Witnesses gave varying accounts of the size and weight of the bedroom safe. Agent Grant described it as approximately three feet by three feet. Bradley M. described it as two feet by two feet, and heavy, but "moveable, definitely." In relation to Bradley M.'s assessment, Jacobson said, Maybe [Bradley M.] could [lift it]; he is bigger than I am but I can't lift it.

the bar closed and he rented the apartment to Bradley M., he was not concerned about leaving the safe with the cash in it because Bradley M. had worked for him for years and he "didn't figure [Bradley M.] could get into it anyways."

After Bradley M. moved out of the apartment at the end of 2002, the apartment was vacant for a while. Jacobson testified that he subsequently rented the apartment to Carlisle in order to have someone around for security purposes and because Carlisle was "having trouble." Jacobson stated that when Carlisle moved into the apartment, Jacobson left the safe in the bedroom, still covered with the towel. Jacobson said he was not concerned about leaving the safe in the apartment because he figured Carlisle would not be able to move it, and Jacobson and the locksmith were the only persons who had the combination. He also stated that Carlisle did not have any ownership interest in the money in the safe.

Jacobson said that he "did pretty well" when he owned Jake's Bar, and he identified personal and corporate tax returns for 1998, 1999, and 2000 that he had offered into evidence. When asked why he left the cash in the safe after he moved out, Jacobson stated, "Well, it was safe; it was in a secure building with a security system, and I wasn't too concerned about it. [Not t]o mention, I make pretty good money. I didn't need it. It was—It was savings." Jacobson also testified that he lost the combination to the safe in 1999 or 2000. In response to the county's suggestion on cross-examination that the money would have been safer in Jacobson's bank account, he said, "It's a good idea to have

some cash available. * * * I didn't want to [deposit the money]. It was fine where it was."

After Jacobson's testimony ended, the district court made what it characterized as "one final attempt" to encourage Jacobson to consider settling with the county. Jacobson stated that he would only consider a settlement that allowed him to keep $50,000 plus the $1,000 bill. He asserted that the money in the safe was clearly his and that he was not a part of Carlisle's drug dealing. The court then responded by stating that, "there is no doubt in my mind you were not involved in [Carlisle's] drug deal. I mean, I don't think there has ever been an allegation or assertion that you in any way participated with this guy. * * * [B]ut I'm trying to give you a hint." Jacobson and the county did not agree to any settlement.

One week after the trial ended, the district court issued an order authorizing the forfeiture of the cash with the exception of the $1,000 bill. The court stated that under the forfeiture statutes, Jacobson was required to rebut the presumption that the cash was subject to forfeiture by a preponderance of the evidence. The court found that Jacobson had failed to rebut the presumption because he had not proved his ownership of the defendant cash and that the cash had innocent origins. In support of this conclusion, the court identified and analyzed numerous items of evidence, including witness testimony, the behavior of the drug-sniffing dog, Jacobson's tax returns,[4] the $1,000 bill, and Jacobson's expired Arizona driver's license.

---

4. In its forfeiture order, the district court stated, "The income that Jacobson reported on his tax returns do[es] not leave the impression of someone who had accumulated enough money to have $55,900 cash laying around in a safe." In response to this finding by the

district court, Jacobson essentially argues that personal income does not necessarily equal "reported" income, and that the district court should have considered the gross receipts from Jake's Bar, which totaled "several hundred thousand dollars per year."

Jacobson moved the district court for amended findings. He asserted that based on Carlisle's testimony, he had effectively shifted the burden of proof to the county. He also requested, among other things, that the court eliminate any findings based on the dog sniff because these findings were irrelevant and prejudicial. The court held a hearing and then denied the motion. The court stated that it was entitled to consider Carlisle's credibility in deciding whether Jacobson had met his burden of proof, and that the court was also entitled to consider the dog sniff evidence as one of several factors in its decision.

Jacobson appealed to the court of appeals. On appeal, he argued that (1) he was only required to present "sufficient evidence" to rebut the statutory presumption of forfeitability; and (2) the district court erred by considering witness credibility when deciding whether he had rebutted the presumption. He also argued that the court erroneously admitted dog sniff evidence for the purpose of establishing a connection between the cash and drug trafficking. Finally, Jacobson argued that the county had not met its ultimate burden of proving, by clear and convincing evidence, a connection between the cash and drug trafficking.

The county responded by arguing that Jacobson was barred on procedural grounds from appealing any errors of law, and that appellate review was limited to whether the evidence sustained the district court's findings of fact and whether the findings in turn supported the court's conclusions of law. The county asserted that the court's findings were consistent with the evidence, and that the court properly considered witness credibility and properly admitted the dog sniff evidence.

The court of appeals affirmed, concluding that there was sufficient evidence to support the district court's finding that Jacobson had failed to rebut the statutory presumption. *Jacobson v. $55,900 in U.S. Currency*, No. A05–60, 2006 WL 163450, at *1 (Minn.App. Jan.24, 2006). The court of appeals declined to consider, on procedural grounds, Jacobson's claims that the district court erred by considering witness credibility and admitting the dog sniff evidence. *Id.* at *3–4. But the court did consider whether the district court had given undue weight to the dog sniff evidence and decided that it had not. *Id.* at *4. The court of appeals also concluded that because the district court reasonably found that Jacobson failed to rebut the statutory presumption of forfeitability, it had not erred by declining to determine whether the county's evidence was clear and convincing. *Id.* at *5.

Jacobson petitioned our court for review. He asked us to review the following two issues: (1) whether a district court may consider witness credibility when it decides whether a claimant has rebutted the statutory presumption of forfeitability; and (2) whether dog sniff evidence is admissible to prove a connection between cash and drug trafficking. We granted review of these issues.

### I.

Before specifically addressing the two issues Jacobson raises, it is helpful to provide a general overview of Minn.Stat. §§ 609.531–.5318 (2006),[5] which set forth the framework for the forfeiture of property associated with drug trafficking and

---

**5.** Although various parts of Minn.Stat. §§ 609.531–.5318 were amended effective July 1 and August 1, 2005, none of the relevant language in the statutory provisions cited in this opinion was changed. Accordingly, for simplicity, all statutory citations are to the 2006 edition of the Minnesota Statutes.

certain other crimes. Forfeiture under these statutes is a civil *in rem* action, generally independent of any criminal prosecution. Minn.Stat. § 609.531, subd. 6a(a) (2006). Minnesota Statutes § 609.5311, subd. 2(a) and subd. 4(b) (2006), respectively provide that property that (1) has facilitated drug trafficking or (2) represents proceeds from such trafficking may be forfeited. Certain law enforcement agencies may seize such property without judicial process if the seizure is incident to a lawful search. Minn.Stat. § 609.531, subd. 4(1) (2006). A person claiming an interest in the property may then demand a judicial determination as to whether the property is connected to drug trafficking and therefore subject to forfeiture. Minn.Stat. § 609.5314, subd. 3 (2006).

A prosecuting agency seeking to forfeit property under the foregoing circumstances benefits from an evidentiary presumption that all money "found in proximity" to drugs is subject to forfeiture. Minn. Stat. § 609.5314, subd. 1(a)(1)(i) (2006). A claimant of the money bears the burden to rebut this presumption. Minn.Stat. § 609.5314, subd. 1(b). The forfeiture statutes are silent as to the claimant's precise burden of proof; but, once the claimant meets his or her burden, the prosecuting agency must then prove, by clear and convincing evidence, that the money is connected to drug trafficking. Minn.Stat. § 609.531, subd. 6a(a). In this case, the parties agree that the defendant cash was found in proximity to drugs and is therefore presumed subject to forfeiture. Their dispute centers on whether Jacobson successfully rebutted the statutory presumption.

Given the foregoing statutory framework, the parties' arguments, and the record before us, it becomes evident that Jacobson's two claims actually raise several separate issues that require our analysis. These issues are whether (1) a claimant seeking to rebut the presumption of forfeitability need only present sufficient evidence; (2) Jacobson's witness credibility argument is procedurally barred because he raised it for the first time on appeal; (3) a district court may consider witness credibility when applying the sufficient evidence standard; (4) Jacobson forfeited his dog sniff claim when he moved for amended findings rather than a new trial; and (5) dog sniff evidence is admissible for substantive purposes in the forfeiture context. We will address each of these five issues in turn.

■ We first address the burden of proof a claimant must meet in order to rebut the presumption of forfeitability under Minn.Stat. § 609.5314, subd. 1(b). Determining the precise nature of the claimant's burden requires an interpretation of the forfeiture statutes. We review the interpretation of a statute de novo. *Blanche v.1995 Pontiac Grand Prix,* 599 N.W.2d 161, 164 (Minn.1999).

Jacobson asserts that a claimant need only produce sufficient evidence that he owns the defendant cash and that it is not connected to drug trafficking. Although Jacobson does not use the phrase "burden of production," he essentially argues that the claimant in a forfeiture case bears a burden of production, rather than a burden of persuasion. A burden of production is "[a] party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against the party in a peremptory ruling," while a burden of persuasion is "[a] party's duty to convince the fact-finder to view the facts in a way that favors that party." *Black's Law Dictionary* 209 (8th ed.2004). The county argues that in order to rebut the statutory presumption, a claimant bears the burden of proving, by a

preponderance of evidence, that he owns the defendant cash and that it is not connected to drug trafficking.

Jacobson relies on our decision in *State v. Slaughter* to support his burden of production argument. 691 N.W.2d 70 (Minn. 2005). In *Slaughter*, a criminal defendant who was tried by the court moved for acquittal at the close of the state's case on the grounds that "the state's witnesses were not sufficiently credible" and that the state had presented insufficient evidence to prove the charged offenses. *Id.* at 72, 73. The district court denied the motion after stating that it would reserve judgment on the weight and credibility of the evidence until the end of the case. *Id.* at 73. We ultimately affirmed the district court, reasoning that the court was applying a "narrow sufficiency of the evidence standard" to decide the motion, while reserving a "broader standard" for its "fact-finding function at the conclusion of the trial." *Id.* at 76. We stated that under the sufficiency of the evidence standard, the district court could reasonably find that the state's evidence, including witness testimony, when viewed "in the light most favorable to the state, * * * was sufficient to allow a reasonable fact-finder to find that [the defendant] committed [the offense charged]." *Id.* at 75–76.

Jacobson argues by analogy to *Slaughter* that in forfeiture cases, the prosecuting agency must be put to its burden of persuasion once a claimant has produced evidence sufficient to support a reasonable conclusion that the defendant property has innocent origins. We conclude that because *Slaughter* arose in a criminal law context and was decided on an issue different from the one now before us, it does not compel the result that Jacobson seeks. But we nonetheless agree with Jacobson's argument that *Slaughter* is informative with regard to this case and supports a conclusion that the burden section 609.5314, subd. 1(b), places on a claimant is the burden of production, which the claimant satisfies on a showing of sufficient evidence.

Jacobson's argument also finds support in the statutory framework of Minn. Stat. §§ 609.531–609.5318, which as a whole supports a conclusion that the burden a claimant bears under section 609.5314, subd. 1(b), is one of producing sufficient evidence. More precisely, such a conclusion helps to harmonize section 609.5314, subd. 1(b), with Minn.Stat. § 609.5311, subd. 3(d) (2006), known as the "innocent owner defense." The innocent owner defense is an affirmative defense available to a claimant who proves that he was not "privy to the use or intended use" of property to facilitate drug trafficking, or that "the unlawful use or intended use of the property otherwise occurred with[out] the owner's knowledge or consent." Minn.Stat. § 609.5311, subd. 3(d); *accord Blanche*, 599 N.W.2d at 167.[6]

While the innocent owner defense does not apply to this case, it is nonetheless helpful in our analysis of the burden a

---

6. Neither section 609.5311, subd. 3(d), nor our case law specifies the burden of proof for the innocent owner defense, but a preponderance of the evidence is typically required to prove affirmative defenses in the civil law. *See, e.g., First Nat. Bank of Hopkins v. International Machines Corp.*, 279 Minn. 188, 190, 193, 156 N.W.2d 86, 87, 89 (1968) (recognizing that failure of consideration must be proved by a preponderance of the evidence); *Quam v. Nelson–Ryan Flight Serv.*, 274 Minn. 475, 476, 144 N.W.2d 551, 552 (1966) (recognizing that contributory negligence and assumption of risk must be proved by a preponderance of evidence); *Eliason v. Prod. Credit Ass'n of Aitkin*, 259 Minn. 134, 138, 106 N.W.2d 210, 213 (1960) (recognizing that facts creating an estoppel must be proved by a preponderance of the evidence).

claimant bears in rebutting the statutory presumption of forfeitability. Specifically, we conclude that it would be unreasonable to interpret the forfeiture statutes to mean that a claimant who establishes the innocent owner defense by a *preponderance of the evidence* defeats the prosecuting agency's forfeiture attempt altogether, while a claimant in Jacobson's position theoretically remains vulnerable to forfeiture if the prosecuting agency can meet its *clear and convincing* burden after the claimant has first proved—by a *preponderance of the evidence*—that he owns the defendant property and that the property has innocent origins. In other words, it is illogical at best to allow some claimants to prevail outright on the basis of a preponderance of the evidence, while subjecting others to a process in which a preponderance of the evidence is only enough to survive an evidentiary presumption. It is well settled that when we seek to "ascertain and effectuate the intent of the legislature" with regard to an ambiguous statute,[7] *Blanche,* 599 N.W.2d at 166 (quotation omitted), we presume that the legislature does not intend a result that is unreasonable. Minn. Stat. § 645.17(1) (2006).

Our case law and that of the United States Supreme Court recognizing the disfavored status of civil forfeiture also support a conclusion that a claimant only bears the burden of producing sufficient evidence to rebut the statutory presumption of forfeitability. In *Riley v. 1987 Station Wagon,* we acknowledged that civil forfeiture is disfavored because it is quasi-penal in nature, and accordingly, forfeiture statutes must be strictly construed against the prosecuting agency. 650 N.W.2d 441, 443 (Minn.2002). Specifically, we stated that although the legislature has expressed that

> Minnesota's forfeiture statutes are remedial in nature and are to be liberally construed[,] * * * the United States Supreme Court has stated that "forfeiture generally and statutory *in rem* forfeiture in particular historically have been understood, at least in part, as punishment." *Austin* [*v. United States* ], 509 U.S. [602, 618], 113 S.Ct. 2801, 125 L.Ed.2d 488 [(1993)]. The Court has also stated that "[f]orfeitures are not favored; they should be enforced only when within both letter and spirit of the law." *United States v. One 1936 Model Ford V–8 De Luxe Coach, Motor No. 18–3306511,* 307 U.S. 219, 226, 59 S.Ct. 861, 83 L.Ed. 1249 (1939). Accordingly, to the extent that the forfeiture law at issue here is, in part, "punishment" and, therefore, disfavored generally, we strictly construe its language and resolve any doubt in favor of the party challenging it.

*Id.*

Finally, Minn. R. Evid. 301 also provides support for our conclusion. The rule states that

> [i]n all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

The associated comment to the rule provides, in relevant part:

---

**7.** Minnesota Statutes § 609.5314, subd. 1(b), does not specify what burden a claimant bears in seeking to rebut the presumption of forfeitability. It is therefore ambiguous as to the burden.

Only the burden of producing evidence is affected by a presumption. A presumption is a procedural device that satisfies the burden of producing evidence. Once the basic facts that give rise to the presumption are established the opponent must produce evidence to rebut the assumed fact or a verdict will be directed on the issue. *If sufficient evidence is introduced that would justify a finding of fact contrary to the assumed fact the presumption is rebutted and has no further function at the trial.*

Minn. R. Evid. 301 comm. cmt.—1977 (emphasis added). In *Shell Oil Co. v. Kapler*, we characterized the burden of rebutting an evidentiary presumption as presenting essentially any "competent evidence."

[A] presumption is merely a procedural device for controlling the burden of going forward with the evidence[,] and * * * it has no additional function other than the limited one of dictating the decision *where there is an entire lack of competent evidence* to the contrary * * *.

235 Minn. 292, 300, 50 N.W.2d 707, 713 (1951).

■ In sum, we conclude—based on the statutory framework of Minn. Stat. §§ 609.531–.5318 as a whole, the disfavored status of civil forfeiture, and Minn. R. Evid. 301—that a claimant rebuts the statutory presumption of forfeitability by producing evidence sufficient to justify a finding that (1) he or she owns the defendant property; and (2) the defendant property is not connected to drug trafficking. Once a claimant has produced sufficient evidence to rebut the presumption, then the prosecuting agency, in order to prevail, must meet its burden of persuasion by producing clear and convincing evidence that the defendant property is connected to drug trafficking. Minn.Stat. § 609.531, subd. 6a(a).

## II.

Having concluded that courts are to apply a sufficient evidence standard when deciding whether a claimant has rebutted the presumption of forfeitability, we next consider whether a court may consider witness credibility when applying that standard. But before considering the merits of this question, we must first address whether Jacobson's witness credibility claim is procedurally barred. Jacobson asserts that he first raised the witness credibility issue in the district court by asking the court to amend its findings on the ground "that [appellant] met his evidentiary burden of shifting the burden of proof, based upon the testimony of Jeffrey Carlislie [sic]." The county argues that under *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988), Jacobson's request was insufficient to preserve the issue because he did not "assign any error to the district court's consideration of witness credibility."

■ In *Thiele*, we held that an appellate court may not consider a "question never litigated below." 425 N.W.2d at 582. But we conclude that *Thiele* is distinguishable from Jacobson's case in at least two respects. First, the argument Thiele made to avoid a grant of summary judgment by the district court was different in kind from the argument she made on appeal.[8] *Id.* at 581–82. Second, Thiele's ar-

8. Thiele initially provided the defendant with defective service of process. *Thiele*, 425 N.W.2d at 581. By the time she completed proper service, according to the defendant, the statute of limitations barred her suit. *Id.* Thiele argued that the defective service of process was sufficient for the purpose of meeting the statute of limitations requirement. *Id.* at 582. The district court rejected this argument and granted summary judgment for the defendant. *Id.* For the first time on appeal, Thiele argued that the limitations

gument on appeal centered on "key facts" that she had never presented to the district court, because those facts were "largely irrelevant to the question litigated there." *Id.* at 583. Here, Jacobson argued to the district court that he had successfully rebutted the presumption of forfeitability "with the testimony of Mr. Carlislie [sic] * * * and by inferences reasonably drawn by all relevant evidence." On appeal, he argues that the court erred in considering witness credibility when it determined whether he rebutted the presumption. While Jacobson has refined the argument he made to the district court, we conclude that he is not raising a new argument on appeal. Further, we conclude that it is possible for us to evaluate this argument on facts already present in the record. Therefore, we conclude that Jacobson's witness credibility claim is properly before us for review.

### III.

We now turn to the merits of Jacobson's witness credibility claim. Specifically, we address whether applying the sufficient evidence standard necessarily precludes a district court from considering witness credibility. The county asserts that forfeiture is a civil proceeding governed by the rules of civil procedure and that here, the court properly considered the credibility of witnesses under Minn. R. Civ. P. 52.01. We conclude that the county has misjudged the relevance of Minn. R. Civ. P. 52.01 to the specific issue before us. Rule 52.01 states, in relevant part, "Findings of fact * * * shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Rule 52.01 requires an appellate court to

recognize a district court's superior opportunity to judge witness credibility. But this requirement does not in turn support the county's assertion that a district court has an "obligation to consider the credibility of the witnesses" when determining whether a claimant has rebutted the statutory presumption of forfeitability.

■ Jacobson argues that under the sufficient evidence standard, a district court's consideration of witness credibility is per se improper. In essence, he asserts that a prosecuting agency that benefits from the statutory presumption is akin to a party who moves the district court for judgment as a matter of law. *See Lamb v. Jordan,* 333 N.W.2d 852, 855 (Minn. 1983) (stating that a court may grant judgment as a matter of law only when " 'reasonable minds cannot differ as to the proper outcome' " and that when applying this standard, "the court may not weigh the evidence or judge the credibility of the witnesses" (citation omitted)). We agree with Jacobson's argument that as a general matter, a district court should not engage in a qualitative evaluation or weighing of the evidence when deciding whether a claimant has produced sufficient evidence to rebut the statutory presumption. Yet we decline his invitation to adopt a per se rule prohibiting any consideration of witness credibility. We reach this conclusion because we can envision cases in which some consideration of witness credibility may be important, or even essential, for example, when the claimant's only evidence is his own testimony, and no reasonable fact finder would believe that testimony.

■ But this is not such a case. Here, the record does not present a close ques-

---

period had commenced not on the date of defendant's breach of duty, as her argument before the district court assumed, but instead

on the date she discovered the breach, approximately six years later. *Id.*

tion as to whether Jacobson met the sufficient evidence standard. Regardless of whether Carlisle was credible, there was sufficient other evidence that could lead a reasonable fact finder to find that Jacobson owned the cash found in the safe and that the cash was revenue from the operation of Jake's Bar. Of particular significance is the collectible $1,000 bill—now worth about $2,000—that agents found in the bedroom safe. The district court found that this bill belonged to Jacobson, and a reasonable fact finder could decide that Jacobson would not leave such a valuable item in a place where his drug-dealing tenant could readily access it. Moreover, while Carlisle might have had reasons to keep more than $14,000 in the microwave even if he had access to the safe, a reasonable fact finder could decide that he would not do so. This decision could in turn support a reasonable inference that the money in the safe belonged to Jacobson. Jacobson also testified about business income that was earned at the same location as the safe and about his practice, when he operated Jake's Bar, of regularly keeping business assets in the safe. Finally, Jacobson did succeed in convincing the district court that he was not involved with Carlisle's drug dealing. When taken together, these facts constitute sufficient evidence to support a reasonable fact finder's decision that Jacobson owned the defendant cash and that it was not connected to drug trafficking. Therefore, we conclude that Jacobson met his burden of production.

Because we conclude that Jacobson met his burden of production, we hold that the district court erred when it found that Jacobson failed to rebut the statutory presumption of forfeitability under Minn.Stat. § 609.5314, subd. 1(b). Accordingly, we remand to the district court for a proceeding in which the county may seek to prove the forfeitability of the defendant cash by clear and convincing evidence.

## IV.

■ We next address Jacobson's dog sniff claim. Our analysis of this claim must begin by determining whether Jacobson forfeited this claim when he moved for amended findings instead of a new trial under Minn. R. Civ. P. 59.01, as required by *Sauter v. Wasemiller*, 389 N.W.2d 200, 202 (Minn.1986). Jacobson asserts that when a district court acts as the trier of fact, as it did here, there is no reason to require that the losing party move for the court to retry the case to address the court's own error. Jacobson argues that in the context of a bench trial, the proper procedure for preserving an evidentiary ruling is to file a motion for amended findings.

■ We have explained that the purpose of requiring litigants to move for a new trial is to

> aid[ ] the district court in reconsidering objections to issues that arose during trial. When objections are made during the course of trial, the court must make quick, on-the-spot decisions. The motion for a new trial gives the court time to consider the context of the objection and the effect the error may have had on the outcome of the case. This permits the court to more fully develop the record for appellate review or to correct its own mistake and alleviate the need for appellate review.

*Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 310 (Minn.2003). We conclude that when, in the context of a bench trial, the losing party asserts that the district court made an erroneous evidentiary ruling, the purposes we articulated in *Alpha Real Estate* are accomplished by a motion for amended findings. Accordingly, we conclude that

Jacobson properly preserved his dog sniff claim.

## V.

We now turn to the key question raised by Jacobson's dog sniff claim—that is, whether the district court erred by admitting dog sniff evidence for substantive purposes in this civil forfeiture proceeding. We review evidentiary rulings for an abuse of discretion. *State v. Litzau,* 650 N.W.2d 177, 182 (Minn.2002).

Jacobson asserts that under Minnesota law, dog sniff evidence is permitted for the limited purpose of establishing probable cause for further searching or for making an arrest, and that "substantial scientific testing" is required to identify controlled substances at trial. He contends that the district court erred when it admitted dog sniff evidence to prove a connection between the defendant cash and drug trafficking. The county argues that in civil forfeiture cases, the prosecuting agency is not required to positively identify drugs and that the agency does not necessarily introduce dog sniff evidence for that purpose. Moreover, the county asserts, our court of appeals and the federal courts have admitted dog sniff evidence to prove a connection between cash and drug trafficking in forfeiture cases.

We have never decided whether dog sniff evidence is admissible for substantive purposes in a civil forfeiture proceeding, but we have addressed two related issues in the criminal context. Specifically, we have addressed the admissibility of evidence derived from dog sniffs in trials for drug crimes and the sufficiency of evidence required to identify drugs beyond a reasonable doubt. While our case law on the foregoing issues does not dispose of the question now before us, it does inform our analysis. Accordingly, we will provide a brief summary of this case law.

Our decisions involving the admissibility of dog sniff evidence in criminal trials have centered on the relatively narrow issue of when the police may use drug detection dogs to *search* for drugs. In *State v. Wiegand,* for example, we held that although a dog sniff around the exterior of a motor vehicle is not a search under the Fourth Amendment or our state constitution, the police must have "reasonable, articulable suspicion of drug-related criminal activity" before conducting the dog sniff. 645 N.W.2d 125, 132–33, 137 (Minn.2002). In *State v. Carter,* we held that a dog sniff conducted outside a self-storage unit is a search under our state constitution, but we said that the police may conduct a dog sniff on reasonable, articulable suspicion of criminal activity rather than probable cause because the government has a "significant" interest in using drug-detection dogs to aid law enforcement. 697 N.W.2d 199, 211–12 (Minn.2005). Where no reasonable, articulable suspicion is shown, we have stated that evidence stemming from a dog sniff is inadmissible. *See id.* at 212 (stating that evidence from an improper dog sniff must be suppressed); *Wiegand,* 645 N.W.2d at 128, 137 (affirming district court's decision to dismiss charges after suppressing evidence that stemmed from improper dog sniff).

The focus of our inquiry in *Wiegand* and *Carter* was whether the police had a sufficient basis *to search for* drugs using drug detection dogs. In an entirely separate line of cases, we have addressed what constitutes sufficient evidence to *identify* drugs seized or observed by the police. We have stated that where the identification of the drug is in question, "[w]e have not prescribed minimum evidentiary requirements * * *, preferring to examine the sufficiency of the evidence on a case-by-case basis." *State v. Vail,* 274 N.W.2d 127, 134 (Minn.1979). Under this case-by-

case approach, "nonscientific" evidence may be sufficient to identify drugs beyond a reasonable doubt in particular circumstances. *See State v. Olhausen*, 681 N.W.2d 21, 28–29 (Minn.2004). In *Olhausen*, for example, we held that the state could meet its burden of proof with regard to a sale of methamphetamine, even though the substance alleged to be methamphetamine was destroyed by the defendant and could not be tested. *Id.* But when the state's case depends substantially on "scientific" evidence, we have concluded that the state must show a high degree of accuracy and precision with regard to the scientific tests it employs. *See, e.g., State v. Robinson*, 517 N.W.2d 336, 339 (Minn.1994) (rejecting random sampling method of testing for cocaine where the total weight of the cocaine is an essential element of the offense); *Vail*, 274 N.W.2d at 133 (acknowledging that three separate laboratory tests to identify marijuana could be inadequate in light of questionable testing practices).[9]

With the foregoing case law in mind, we return to the question of whether dog sniff evidence is admissible for substantive purposes in a civil forfeiture proceeding. We note that in such a proceeding, unlike a trial for drug crimes, the prosecuting agency need not prove the existence of drugs. The agency must instead prove that the cash it seeks to forfeit in some way facilitated or resulted from drug trafficking. Minn.Stat. §§ 609.531, subd. 6a(a), 609.5311, subd. 2(a). Accordingly, we address whether dog sniff evidence—particularly, a dog's "alert" to drug odor

on cash—is relevant to establishing whether that cash is connected to drug trafficking. *See* Minn. R. Evid. 402 ("All relevant evidence is admissible, except as otherwise provided by [the federal or state constitution], statute, * * * these rules, or by other rules applicable in the courts of this state."); Minn. R. Evid. 401 comm. cmt.— 1977 ("The threshold test for the admissibility of evidence is the test of relevancy.").

Relevant evidence is "evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401 (emphasis added); *accord State v. Horning*, 535 N.W.2d 296, 298 (Minn.1995). In deciding whether a piece of evidence has any tendency to prove a material fact, "[i]t is enough if [that evidence] could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable." 1 *McCormick on Evidence* § 185, at 733 (Kenneth S. Brown ed., 6th ed.2006) (footnotes omitted).

Despite the relatively low threshold that relevancy presents, some courts have concluded that dog sniff evidence is so lacking in probative value that it is "virtually meaningless" on the question of whether cash is connected to drug trafficking. *Muhammed v. Drug Enforcement Agency*, 92 F.3d 648, 653 (8th Cir.1996).[10] Much of

9. We note that *Olhausen, Vail,* and *Robinson* are all criminal cases involving the highest standard of proof—beyond a reasonable doubt—as to the identity of drugs.

10. We note that before August 23, 2000, the effective date of the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983(c)(1) (CAFRA), the federal government could forfeit

cash after establishing probable cause as to the connection between the cash and drug trafficking. *United States v. Funds in the Amount of $30,670*, 403 F.3d 448, 454 n. 4 (7th Cir.2005). CAFRA raised the government's burden in forfeiture proceedings to a preponderance of the evidence. *Id.* As previously stated, Minnesota law requires prosecuting agencies to establish the forfeiture by

the criticism of dog sniff evidence has centered on the "currency contamination" theory, which essentially holds that most cash in general circulation—as much as 97 percent in some studies—is contaminated with trace amounts of cocaine. *See United States v. Carr*, 25 F.3d 1194, 1215 n. 6 (3d Cir.1994) (Becker, J., concurring in part and dissenting in part); *see also United States v. Funds in the Amount of $30,670*, 403 F.3d 448, 455–56 (7th Cir.2005) (discussing studies that indicate a 70 to 90 percent currency contamination rate). Courts rejecting dog sniff evidence on the basis of the currency contamination theory conclude that as a result of widespread currency contamination, it is "almost certain" that every American carries "drug-tainted" money. *Carr*, 25 F.3d at 1215 n. 6 (Becker, J., dissenting) (citing Mark Curriden, *Courts Reject Drug–Tainted Evidence*, 79 A.B.A.J. 22 (Aug.1993) (quoting forensic chemist Dr. James Woodford)).[11]

But courts are increasingly reconsidering and rejecting the currency contamination theory as it relates to the reliability of dog sniffs. *See $30,670*, 403 F.3d at 459 ("More recently, \* \* \* courts have \* \* \* moved away from unquestioning acceptance of the currency contamination theory."). For example, in *United States v. $22,474 in U.S. Currency*, the Ninth Circuit acknowledged the probative value of a "sophisticated dog sniff" performed by an appropriately trained dog, despite that

court's prior adoption of the currency contamination theory. 246 F.3d 1212, 1216–17 (9th Cir.2001). And in *United States v. $242,484*, the Eleventh Circuit declined to adopt the currency contamination theory in the absence of expert testimony in the record to support it and deemed a dog alert to be relevant to establishing a connection between cash and drug trafficking. 389 F.3d 1149, 1165–66 (11th Cir.2004). In *Evans v. City of Aberdeen*, the Mississippi Supreme Court expressly rejected the currency contamination theory based on the Seventh Circuit's reasoning in *$30,670*, and concluded that a dog's alert to cash is relevant when a "proper dog sniff test" is administered. 926 So.2d 181, 185 (Miss. 2006). The Intermediate Court of Appeals of Hawaii also recently determined that dog sniff evidence is admissible as long as the sniff is properly conducted, notwithstanding the currency contamination theory. *State v. Keaweehu*, 110 Hawai'i 129, 129 P.3d 1157, 1164–66 (2006).

According to the Seventh Circuit's decision in *$30,670*, emerging research tends to undermine the currency contamination theory insofar as it affects the reliability of dog sniffs. 403 F.3d at 455–60. In *$30,670*, the court asked the parties to provide supplemental briefs based on the record and if needed, any publicly available empirical information, to address "[h]ow frequently \* \* \* drug detection

---

clear and convincing evidence if a claimant rebuts the statutory presumption of forfeitability. Minn.Stat. § 609.531, subd. 6a(a). Despite the differences in burdens of proof between federal and state forfeiture law, the reasoning of federal cases with respect to the admissibility of dog sniff evidence is apposite to the extent that it focuses on the *probative value* of such evidence. *See, e.g., Funds in the Amount of $30,670*, 403 F.3d at 455.

11. Aside from currency contamination, another factor that could undermine the probative value of a dog sniff is the "handler cue,"

which is a "conscious or unconscious signal[ ] given from the handler that can lead a detection dog to where the handler thinks drugs are located." Robert C. Bird, *An Examination of the Training and Reliability of the Narcotics Detection Dog*, 85 Ky. L.J. 405, 424 (1997). *See also* Richard E. Meyers II, *In the Wake of Caballes, Should We Let Sniffing Dogs Lie?*, Criminal Justice, Winter 2006, at 4, 8–9, 13 (recommending that dog sniffs be videotaped "to ensure that the result is reliable and not a reaction to cuing from a handler").

dogs falsely alert to currency that is not demonstrably related to the drug trade, but has been contaminated by prior owners." *Id.* at 453. The studies cited by the parties indicate that drug detection dogs "do not alert to cocaine itself but rather to methyl benzoate." *Id.* at 456, 457–58. Methyl benzoate is a cocaine byproduct that " 'evaporate[s] rapidly from the surface of paper currency at a rate of approximately 90% in 120 minutes.' " *Id.* at 456–57 (quoting Charles Mesloh et al., *Sniff Test: Utilization of the Law Enforcement Canine in the Seizure of Paper Currency*, 52 J. Forensic Identification 704, 709 (2002)). In response to these studies, the Seventh Circuit noted, "[I]t seems that dogs cannot smell cocaine at all because the narcotic acts as an anesthetic that deadens olfactory senses." *Id.* at 458 (citing an affidavit discussing the results of scientific research on dog sniffs). The Seventh Circuit ultimately concluded that, on the basis of the research-intensive record in *$30,670*, "a properly trained dog's alert to currency should be entitled to probative weight." *Id.* at 459.

■ We agree with the reemerging view that a dog's alert could meet the relatively low threshold for relevance on the question of whether cash is connected to drug trafficking. *See Horning*, 535 N.W.2d at 298 ("Rulings involving the relevancy of evidence are generally left to the sound discretion of the trial court."). But we note that relevance alone does not guarantee the admissibility of such evidence. *See, e.g.,* Minn. R. Evid. 403 (ex-

cluding relevant evidence under certain circumstances). More particularly, when dog sniff evidence is introduced at trial through the expert testimony of the dog's handler, that testimony is governed by Minn. R. Evid. 702 and 703. Minn. R. Evid. 702 comm. cmt.—1977 ("[Rule 702] is not limited to scientific, or technical areas, but is phrased broadly to include all areas of specialized knowledge."). A dog's alert, as interpreted for the court by the dog's handler, is therefore only admissible if it assists the trier of fact and if there is a reasonable basis for it. Minn. R. Evid. 702, 703. In other words, the party seeking to introduce the alert and related testimony must establish an adequate foundation. *See State v. Harris,* 713 N.W.2d 844, 848 (Minn.2006) (stating that evidence offered under Minn. R. Evid. 703 must be supported by adequate foundation).

■ The concurrence suggests that Minn. R. Evid. 702 and 703 do not set a sufficiently rigorous standard for evaluating the admissibility of dog-sniff evidence to prove a connection between cash and drug trafficking, and that dog-sniff evidence must instead be subjected to the *Frye–Mack* test.[12] We disagree on the ground that the *Frye–Mack* test applies to "evidence based on emerging scientific techniques," *State v. Jobe,* 486 N.W.2d 407, 419 (Minn.1992), and the technique of using trained dogs to detect drug odors is neither emerging nor scientific. *Cf. Brooks v. People,* 975 P.2d 1105, 1111 (Colo.1999) (stating that the *Frye* test is inapplicable to evidence not derived from

12. Where applicable, the *Frye–Mack* test requires that " 'experts in the field widely share the view that the results [of scientific testing] are scientifically reliable as accurate.' " *State v. Jobe,* 486 N.W.2d 407, 419 (Minn.1992) (citation omitted); *see also* 11 Peter N. Thompson, *Minnesota Practice—Evidence* § 702.01 n. 1 (3d ed. 2001) ("If the expert opinion involves 'novel' scientific evidence

then the proponent must also establish that the scientific theory is generally accepted in the appropriate scientific community."). The *Frye–Mack* test is our restatement, in *State v. Mack,* 292 N.W.2d 764, 768 (Minn.1980), of a test the D.C. Circuit articulated in *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir. 1923). *Jobe,* 486 N.W.2d at 419.

"hard science" and therefore declining to apply *Frye* to canine scent-tracking evidence). When a dog's handler testifies regarding his dog's alert to drug odor, he offers an expert opinion as to the meaning of a particular set of behaviors displayed by a "living, breathing, animate creature," *id.* at 1112; he does not interpret the results of a "scientific process, principle, technique or device." *State v. Roscoe*, 145 Ariz. 212, 700 P.2d 1312, 1320 (1984) (declining to apply the *Frye* test to a dog's identification of a defendant through scent). For the foregoing reasons, we conclude that courts are to evaluate the admissibility of dog-sniff evidence on a case-by-case basis by applying Minn. R. Evid. 702 and 703—that is, by determining whether such evidence and the expert testimony through which it is introduced are (1) helpful to the trier of fact; and (2) supported by an adequate foundation.

■ Having determined that Minn. R. Evid. 401, 702, and 703 provide the proper analytical framework for the issue now before us, we turn to the admissibility of the dog sniff evidence the county introduced in this case. Here, marijuana was one of the drugs Nikki, the certified drug detection dog, was trained to detect, and a large quantity of marijuana was found in Carlisle's apartment. The fact that Nikki alerted to the cash from the safe has at least *some* tendency to establish that the cash had been exposed to marijuana and consequently, at least *some* tendency to establish that the cash facilitated Carlisle's marijuana sales or resulted from such sales. *See, e.g., United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 502 (8th Cir.2004) (stating that a dog's alert to cash provided "some—albeit slight—indication" that the cash was connected to drug trafficking); *United States v. Saccoccia*, 58 F.3d 754, 777 (1st Cir.1995) (noting that a trained dog's alert has some probative val-

ue in determining whether cash is connected to drug trafficking). For the foregoing reasons, we conclude that the district court did not abuse its discretion in apparently finding that the dog sniff evidence was relevant.

■ As to the foundation for Nikki's alert as interpreted by Officer Frisby, we have consistently stated that absent clear error, we will not reverse a district court's determination of the adequacy of the foundation offered for expert witness testimony. *State v. DeShay*, 669 N.W.2d 878, 884 (Minn.2003) (citing *State v. Nystrom*, 596 N.W.2d 256, 259 (Minn.1999)). An adequate foundation for dog sniff evidence in the civil forfeiture context would comprise facts such as the certification(s) the dog has achieved, and the nature and extent of the training both the dog and the handler have completed. *See* Bird, *supra*, at 422 ("The handler's performance [as trainer and interpreter] is inseparably intertwined with the dog's overall reliability rate.") (quoting *United States v. Paulson*, 2 M.J. 326, 330 n. 5 (A.F.C.M.R.1976)).

A drug detection dog's accuracy rate is also critical to establishing an adequate foundation. A dog's accuracy rate encompasses not only the total number of accurate alerts the dog has made, but also the number of times the dog has failed to alert to drugs and the number of times the dog has alerted in the absence of drugs. *Id.* at 425–26. Finally, the agency seeking to admit the dog sniff evidence must establish the steps taken to ensure a reliable test of the particular cash at issue. If the agency cannot establish such steps, the dog sniff evidence should not be admitted. For example, in *Evans*, the Mississippi Supreme Court concluded that a dog sniff test was improperly conducted and therefore unreliable because, by the handler's admission, the testing environment and the bag in which he placed the subject cash might

have been contaminated. 926 So.2d at 185.[13]

▉ Frisby testified that Nikki completed regional certifications through the United States Police Canine Association at least once per year and national certifications in 2003 and 2004. He also described the initial and maintenance training Nikki completed to detect drug odors in general and drug odors on cash. He emphasized that Nikki had been trained to detect the base odors and derivatives of drugs, rather than the drugs themselves. But when asked about Nikki's error rate, Frisby could not provide a clear answer and could only "guesstimate" that Nikki had an error rate of one to two percent. Moreover, the county did not introduce any documentation to support Frisby's description of Nikki's training, certifications, or accuracy, despite the admitted existence of a record for every training sniff Nikki had completed.

Setting aside potential gaps in the foundation for Nikki's reliability in general, we are troubled by the lack of foundation supporting Nikki's alert to the cash found in Carlisle's apartment. Frisby testified about the steps he took to ensure that (1) drug agents did not contaminate the cash; and (2) that the surface of the bed, where the sniff was conducted, was free of drug odor. But the cash was found in a safe— and the length of time it would take for odor to dissipate from cash so stored was never established in the district court. Frisby testified generally on the tendency of drug odor to dissipate, but after he began to speculate about how conditions in a safe might slow the dissipation process, the court stopped him. The court ultimately concluded that Frisby did not have the qualifications to address how the storage conditions might affect the reliability of Nikki's alert. Absent a foundation for the reliability of a dog sniff under these particular conditions, we are unable to conclude that Nikki's alert was helpful to the trier of fact or that there was a reasonable basis for it. Minn. R. Evid. 702, 703.

For the foregoing reasons, we hold that to the extent the district court admitted the dog sniff evidence as substantive proof that the cash found in the safe was connected to drug trafficking, the court committed clear error.[14] If, on remand, the

13. Our analysis of Jacobson's dog sniff claim is predicated on our conclusion that what is at issue here is *who decides* whether dog sniff evidence is relevant and sufficiently reliable to be helpful to the trier of fact in a civil forfeiture trial. It is well established that as a general matter, we leave evidentiary determinations involving relevance and foundation to the sound discretion of our district courts. *See, e.g., Turnage v. State,* 708 N.W.2d 535, 542 (Minn.2006); *see also Horning,* 535 N.W.2d at 298; Minn. R. Evid. 702 comm. cmt.—1977 ("The admissibility of expert opinion has traditionally rested in the discretion of the trial court."). Despite this well-established principle, the concurrence appears to advocate an absolute rule barring *dog sniff evidence for substantive purposes* from all civil forfeiture trials. We decline to adopt such a rule because we are not persuaded that dog sniff evidence is per se irrelevant and that there are *no conceivable cir*-

cumstances in which a proponent of such evidence could provide an adequate foundation for it. We are unpersuaded because the record here contains neither expert testimony nor other evidence tending to support the foregoing conclusions. Accordingly, we see no basis for absolutely prohibiting district courts from deciding whether dog sniff evidence is relevant, helpful, and sufficiently reliable *in the context of a particular case.* We note that if and when we are confronted with a record akin to the one the Seventh Circuit reviewed in *$30,670,* it may then be appropriate for us to revisit the merits of the approach the concurrence urges.

14. It is not entirely clear what purpose the dog sniff evidence served in the district court proceeding, given that (1) the county benefited from the presumption that the cash was subject to forfeiture based on its proximity to

county attempts to prove by clear and convincing evidence that the cash is subject to forfeiture, the court may admit the dog sniff evidence—but only if the county establishes a proper foundation for the evidence under Minn. R. Evid. 702 and 703.[15]

Reversed and remanded for further proceedings consistent with this opinion.

Concurring, HANSON, PAGE, MEYER, JJ.

HANSON, Justice (concurring).

Although I concur with the decision of the majority to reverse the forfeiture order and remand for further proceedings, I write separately to express the view that the evidence of the dog sniff should not be admitted at any new trial. I conclude that the evidence of the dog sniff is inadmissible both because it is not relevant under Minn. R. Evid. 401 and because it does not qualify as expert testimony under Minn. R. Evid. 702 and 703.

I have no doubt that certified drug detection dogs provide valuable assistance to law enforcement in the investigation of a crime. Likewise, I agree that such a dog's alert may provide probable cause to support a search. But in a trial, proof that contraband is present or has contaminated other property should not be shown by the fact of the dog's alert, but by scientific tests performed on the contraband or contraband contaminated property that is discovered during the search. It is unlikely that anyone would argue otherwise in a criminal context, and I find no basis for making any evidentiary distinction simply because forfeitures are civil proceedings that are subject to different burdens of proof.

Before applying the evidentiary rules, I will first state a series of interrelated concerns I have with the use of a dog's alert as substantive evidence to prove the chemical composition of the object of that alert.

There are at least two serious layers of subjectivity involved in dog sniff evidence. There is first the subjectivity of the interpretation by the dog's handler of the actions of the dog. Unlike the gauge on a breathalyzer, the movements of a dog are imprecise and they are not subject to precise verification. Of course, the dog handler is the witness at trial and can be cross-examined about his or her interpretation, but the subjectivity that depends on the handler's familiarity with the dog, the handler's care to avoid a "handler's clue," and the handler's ability to extrapolate from a controlled testing environment to the endlessly variable environments present in the field, cannot be eliminated and cannot be tested by cross-examination.[1]

---

a controlled substance; and (2) the court found that Jacobson was unable to rebut the presumption.

**15.** Our opinion should not be read to preclude a claimant from objecting to the admissibility of dog sniff evidence on bases other than lack of foundation. For example, a claimant may argue that in the context of his particular proceeding, the probative value of a dog alert is substantially outweighed by the danger of unfair prejudice and should therefore be excluded under Minn. R. Evid. 403.

**1.** Our longstanding rule against the admissibility of lie detector tests is based in part on the inability to remove subjectivity from the operator's interpretation. *See, e.g., State v. Kolander,* 236 Minn. 209, 221–22, 52 N.W.2d 458, 465 (1952).

> We have no doubt that the lie detector is valuable in investigative work of law enforcement agencies and may frequently lead to confessions or the discovery of facts which may ultimately lead to the solution of many crimes; but we are in accord with the rule that the lie detector has not yet attained such scientific and psychological accuracy, *nor its operators such sureness of interpretation of results shown therefrom,* as to justify submission thereof to a jury as

In the record before us, for example, Officer Frisby discussed the dog's alert in this imprecise way:

> [H]er alert once she starts locating drug odor, is a physical change and response that she only has when she's locating drug odor. Her alert is she closes her mouth and her breathing changes; it becomes deeper and more rapid. Once she pinpoints the source of the odor, she'll go into an indication. * * * Her indication is an aggressive indication. She bites and scratches at the source of the odor.

Officer Frisby acknowledges that each dog may alert differently.

Of perhaps greater concern is the subjectivity of the dog. The dog is, in reality, the expert witness who is opining that the object contains an odor of contraband. On what does the dog base that opinion? Unlike a human expert witness, the dog cannot say, and unlike a mechanical measuring device, a dog is a complex organism that cannot be calibrated to eliminate errors in judgment or random false alerts. Of course, the dog cannot explain why he or she alerted to an object, and the right to cross-examine the dog's reasons disappears into a black hole. As can be seen in the majority's discussion of the "currency contamination theory," it apparently is difficult for anyone to explain scientifically why a dog alerts to an object or precisely what that alert means.

These subjectivity concerns are not as material in a probable cause context, because the sniff is only used to justify the search and the ultimate proof is in the seized objects to which the dog alerted. But in the case before us, the seized objects were never tested and thus they provided no proof of contamination.

Further, a dog's alert is nonspecific. For the dog in this case, the same alert is given for marijuana, methamphetamine, cocaine, heroin, and psilocybin mushrooms.[2] Again, this failure to be specific is not a problem in the probable cause context because all five substances are illegal and the alert will provide a basis for a search for any one of those substances. But, again, the proof will be in the object that is found during the search, not in the dog's alert. Surely, a person could not be convicted on the basis of a dog's alert, which would indicate the presence of one or more of five illicit drugs, without evidence of which specific illicit drug was present.

### A. Rule 401.

I conclude that evidence of the dog sniff does not meet the requirements for relevance under Minn. R. Evid. 401, which provides that " '[r]elevant evidence' means having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The forfeiture statute, as it applies to cash, authorizes forfeiture of all property "that represents proceeds derived from or traceable to" the "manufacturing, compounding, processing, delivering, importing, cultivating, exporting, transporting, or exchanging of contraband or a controlled

---

evidence of the guilt or innocence of a person accused of a crime.

*Id.* (emphasis added). Of course, a lie detector test deals with a defendant's credibility, not a physical fact, so our lie detector rule is not directly applicable.

**2.** Conceivably, the same alert might be given for elements of any of these five combination drugs, even when those elements might exist in another, completely legal form, i.e., Sudafed as an element of methamphetamine or methyl benzoate as an element of common solvents, insecticides, or perfumes.

substance that has not been lawfully manufactured, distributed, dispensed, and acquired." Minn.Stat. § 609.5311, subds. 2(a) and 4(b) (2006). Notably, forfeiture cannot be based on mere possession. The only evidence of an unlawful use in this record is the testimony of Carlisle that he sold marijuana out of the apartment—presumably satisfying the statutorily proscribed uses of "processing," "exchanging," and "delivering." As a result, the precise question of "fact that is of consequence to the determination of [this forfeiture] action" is whether the cash in the safe represents proceeds of Carlisle's processing, exchanging, or delivering of marijuana.

In that context, the dog's alert to the cash only supports, at most, the inference that the cash may have been in proximity to one of five controlled substances: marijuana, methamphetamine, cocaine, heroin, or psilocybin mushrooms. Because the dog's alert cannot be specifically interpreted as an indication of the presence of marijuana, it is not probative of the question of fact that is of consequence to the determination of the action. And, although the dog's alert might support an inference that the cash may have been in the presence of one of the other illicit drugs, that inference is not probative of any fact that is of consequence to the determination of the action because the mere possession of any of those drugs would not satisfy the use requirements of the forfeiture statute. Because the dog sniff evidence is not probative of any "fact that is of consequence to the determination of [this forfeiture] action," I conclude it is irrelevant under Minn. R. Evid. 401.

I reach that conclusion without needing to resolve the "debate" about the "currency contamination theory." But were I to reach that issue, I would conclude that, by definition, the existence of the debate precludes the use of dog sniff evidence under our application of the *Frye–Mack* test for scientific evidence, which requires that the scientific principle be "sufficiently established to have gained general acceptance in the particular field in which it belongs." *State v. Mack*, 292 N.W.2d 764, 767 (Minn. 1980) (quoting from *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923)). On the scientific questions of whether most of the currency in circulation is contaminated with trace amounts of cocaine, and whether dogs alert to the residue of cocaine on currency or only to the byproduct, methyl benzoate, I have these observations:

1. There is no evidence in this record on the issue, nor have we decided any other case where the competing scientific studies were adequately developed in the record or where we determined which point of view—contamination or no contamination, cocaine or methyl benzoate—has gained general acceptance in the scientific community. In such a situation, the majority is on thin ice when it attempts to resolve these debated scientific issues by relying on the interpretation given by other courts to selected scientific studies that were not even tested in the evidentiary record before those courts and were considered in the context of different legal standards—for example probable cause versus clear and convincing evidence, and *Frye–Mack* versus *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Surely, the rejection of the contamination theory is not so firmly established in the scientific literature as to be subject to judicial notice.

2. As noted, many of the established cases that reject the contamination theory have done so without a developed record and, as revealed by their opinions, without a comprehensive review of the scientific studies. Foremost among these is the decision in *United States v. Funds in Amount of $30,670.00*, relied upon by the

majority. 403 F.3d 448, 457–59 (7th Cir. 2005). The court begins its analysis by acknowledging that there "appears to be some scientific and legal debate" regarding the "probity of dog alerts to currency." *Id.* at 453–54. The court then notes that there is a further scientific debate on "whether dogs alert only to cocaine itself or rather to the odor of a cocaine byproduct, such as methyl benzoate." *Id.* at 455. To resolve these scientific debates, the court invited the parties to submit scientific articles at the appellate level—none existed in the evidentiary record and no hearing had been conducted to elicit or test competing scientific opinions.

The court ultimately criticized the scientific articles and case law relied on by the claimant because, although studies show that "70–90% of circulated paper currency in major U.S. cities is contaminated with trace amounts of cocaine," some other studies conclude "that dogs *likely* do not alert to cocaine itself but rather to methyl benzoate," which evaporates rapidly from currency. *Id.* at 456–57 (emphasis added). The court then relied on the studies presented by the government that had been performed by Drs. Kenneth Furton and Stefan Rose and that criticized the currency contamination theory. The court essentially adopted the conclusions of Drs. Furton and Rose that "dogs do not alert to byproducts other than methyl benzoate and would not alert to synthetic 'pure' cocaine unless methyl benzoate was added." *Id.* at 457–58. In other words, the court did not address the issue relevant to a *Frye–Mack* test, namely, whether the theories of Drs. Furton and Rose were generally accepted in the scientific community. Instead, the court, acting as fact finder at the appellate level, simply decided that the theories of Dr. Furton and Rose were scientifically correct.

3. In sharp contrast to the seventh circuit's approach, the other recent cases, relied on by the seventh circuit as having stepped back from the currency contamination theory, apparently had an evidentiary record of opinion testimony on these debated scientific issues. *See, e.g., United States v. $22,474.00 in U.S. Currency,* 246 F.3d 1212, 1216 (9th Cir.2001) (noting that the "government presented evidence that the dog would not alert to cocaine residue" but would only "alert to the odor of a chemical by-product of cocaine called methyl benzoate," and that the government's evidence that the dog would not have alerted unless the currency had recently been in the proximity of cocaine was undisputed); *United States v. $242,484.00,* 389 F.3d 1149, 1165–66 (11th Cir.2004) (noting that "no one with any expertise testified in support of [the claimant's] ever-lasting scent, global contamination theory" and, to the contrary, the claimant had elicited evidence that there is a shelf life to narcotics on currency). In fact, the ninth circuit, after *$242,484.00,* made it clear that a dog sniff alert does not provide "sufficient evidence of a meaningful connection between seized money and illicit drugs unless the dog is trained to perform, and performs, a sophisticated dog alert"—meaning, that the state "must present evidence that the drug detection dog 'would not alert to cocaine residue found on currency in general circulation [and that] the dog was trained to and would only, alert to the odor of a chemical by-product of cocaine called methyl benzoate.'" *In re $80,045.00 in U.S. Currency,* 161 Fed.Appx. 670, 671–72 (9th Cir.2006) (quoting *$22,474.00 in U.S. Currency,* 246 F.3d at 1216.).

4. The cases that appear to adopt the methyl benzoate theory of dog sniff drug detection do not discuss the fact that methyl benzoate is a common chemical used in multiple consumer products—solvents, insecticides, perfumes, etc. Perhaps the

underlying studies eliminate the possibility that a dog may alert to the innocent presence of methyl benzoate from the use of those products, but the court decisions that discuss the studies do not so indicate. The majority opinion here must rely solely on the broad, untested conclusions of other courts because we have no scientific evidence in the record before us.

5. The record before us has none of the specificity that is required to constitute foundation for a "sophisticated dog sniff," even in those courts that have rejected the currency contamination theory. Officer Frisby, the dog's handler, was clearly not qualified to testify about the scientific debate that surrounds cocaine. And, contrary to the conclusion reached by the majority that dogs do not alert to cocaine residue, Officer Frisby testified that this dog had been trained to alert to "the base odors and derivatives" of five illicit drugs, including cocaine. Officer Frisby could not establish any basis for a "sophisticated dog sniff," as defined by the ninth circuit, because he was not qualified to testify that the dog would not alert to cocaine but would only alert to methyl benzoate. And, as everyone apparently agrees, Officer Frisby was not qualified to testify to the evaporation rates of methyl benzoate on currency.

6. Our inability to resolve the scientific debate concerning cocaine is not made irrelevant because this case involves marijuana. In fact, our concerns should be even greater because we have not been provided with any studies that identify what chemical element in marijuana causes a dog to alert and none of the decisions of other courts refer us to such studies. We have no information about whether dogs alert to the residue of marijuana or to some derivative and, if the latter, whether that derivative commonly exists in innocent consumer products.

One could argue that this case should not be analyzed under the scientific evidence rules because a dog's alert is not scientific. This, of course, begs the question. If the dog's alert is not scientific proof of the existence of a chemical on currency, what is it? If it is less than scientific—that is, if it is not an objective phenomenon that can be explained and verified, why should a court permit the fact finder to give it any weight? And, surely, it is not more than scientific.

Based on the record before us, and the state of scientific literature on the subject, I conclude that a dog sniff is irrelevant to prove the chemical composition of an object and the admission of dog sniff evidence as substantive evidence of the contamination of currency by an illicit drug violates Rule 401 and our *Frye–Mack* test. This conclusion would not unduly hamper law enforcement because the dog sniff may still be used as an investigative tool and, when it results in the discovery of contraband or contraband contaminated property, law enforcement can rely on the scientific testing of that contraband and property.

## B. Rules 702 and 703.

I also conclude that evidence of the dog sniff does not meet the requirements of Minn. R. Evid. 702, which provides that a qualified expert witness may testify to opinions on matters that involve "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence or to determine a fact in issue," or Minn. R. Evid. 703, which requires that the facts or opinions of an expert witness be of the "type reasonably relied upon by experts in the particular field." Both rules deal with the foundation that must be laid before expert opinion evidence is admissible.

The majority acknowledges that the foundation for the use of the dog sniff was lacking because Officer Frisby could not provide a clear answer on the dog's error rate; did not introduce documentation supporting the dog's training; and provided no evidence on the dog's reliability under the field conditions. The majority suggests that the county should be given an opportunity to supply further foundation on remand at a new trial. I disagree for several reasons.

First, for the reasons stated above, I conclude that the dog sniff is not relevant and thus is not admissible no matter what further foundation is added.

Second, I see no reason to provide the county a second opportunity to develop further foundation. The county had the opportunity to present evidence of the dog's error rate, training process, and the effects of the field conditions at the first trial. The majority's conclusion that the county failed to provide sufficient foundation would lead me to conclude that the dog sniff evidence cannot be used in any new trial because the county has not identified any compelling reason to excuse the county's failure to provide sufficient foundation at the first trial.

PAGE, Justice (concurring).

I join in the concurrence of Justice Hanson.

MEYER, Justice (concurring).

I join in the concurrence of Justice Hanson.